**PONCE v. McGRATH, Attorney General.**

**Civ. A. No. 10511.**

United States District Court
S. D. California, Central Division.

June 19, 1950.

William E. Empey and Andrew R. Bratter, North Hollywood, Cal., for plaintiff.

Ernest A. Tolin, United States Attorney, Clyde C. Downing, Assistant United States Attorney, and Arline Martin, Assistant United States Attorney, all of Los Angeles, Cal., for defendant.

METZGER, Chief Judge.

This is a case under section 503 of the Nationality Act, 8 U.S.C.A. § 903, wherein the complainant prays to have his cancelled citizenship restored.

Plaintiff was born at San Pedro, California, March 10, 1926, of Mexican parents who were married in the United States and had resided in California for a number of years. At the age of three or thereabouts his father, who claimed to have served on American ships and in the Army of the United States following World War I,

took his family on a visit to Mexico intending to return to California in a few months but, so he testified under oath in 1949, lost his identification papers and was unable to get back except on temporary Mexican passports.

Plaintiff remained with his parents at various places in Mexico, living in environments of ignorance, poverty, and sickness until he was twenty years of age, and received schooling equivalent only to the third grade. The family of seven or eight lived in a two-room house most of the time, and he and his sister, Maria, testified that they had no electricity, telephone, radio, or newspaper in their home. He never heard radio until 1946.

In 1946, through the help of an aunt residing in Hollywood, he was able to come to Hollywood where he lived with relatives for about three years and obtained employment as a laborer. In 1949 he made a trip to visit his parents at Chihuahua, Mexico, and, upon attempting to return on June 27, 1949, was detained by Immigration officials for questioning as to why he had remained in Mexico during the war period in violation of section 401(j) of the Nationality Act of 1940, as amended, 8 U.S.C.A. § 801 (j). Hearing before a Board of Special Inquiry was held at San Ysidro, California, July 15, 1949. It was the opinion of the Board, as stated by its Chairman, an Inspector, who also acted as its reporter, that plaintiff "remained in Mexico from the time of his 18th birthday until October 1946, more than a year after the determination of hostilities, for the sole purpose of avoiding United States military service." His citizenship was declared by the Board to be forfeited, and he was excluded from entry and turned back into Mexico and, upon appeal to the Commissioner, the decision of the Board was affirmed upon the record presented.

The case has presented more than usual difficulties in determining with certain finality the controlling element: whether plaintiff remained outside the United States during World War II, after he had attained the age of eighteen years, for the purpose of avoiding war duty.

His testimony, as reported by the Immigration Special Board of Inquiry at San Ysidro, would certainly convict him; whereas, his testimony before this court supplemented and corroborated by that of his sister, Maria, would exonerate him.

The court is left to draw on its experience and general understanding, and perhaps intuition, in dealing with persons of humble birth reared in environments lacking educational and social advantages, to determine the emotional reactions and probable truth of answers made by such inexperienced persons of immature age when suddenly thrust into a situation which causes them great apprehension in ignorance of the purpose and possible outcome of testimony which they may give in answer to interrogations which may be strange to them.

Frequently have I learned from irrefutable proof submitted at a later time, that answers made under intense excitement and fear and in an apparent desire to meet agreement and satisfy the questioner and have the matter over with, were utterly false; the falsity of which later was fully realized by the answering person but unexplainable by him when confronted with some of his answers.

The plaintiff could not have understood the meaning of many of the words used in the hearing, many of which he probably had never heard before, either in Mexican or in English. He had no counsel and no money with which to have employed one had he known the need for counsel, nor had he a friend present during most of the hearing.

In handling numerous Chinese immigration cases, I have learned that quite a few Immigration Officers are tough, rough, and designing in their methods of examination, arising, no doubt, from many cases in which they have been fraudulently imposed upon, so that any case which causes the least suspicion in any one of their immediate group, is processed in a manner calculated to win a complete victory over the suspect in the record of testimony procured;

I do not mean that there is any direct evidence in this case that the Board's record has within it a showing of sharp practice by any member or other person in a position to perpetrate such, but I know there are nearly always so many opportunities in Board hearings for such arts, that I cannot accept a Board's findings as being a final and fair trial when equally substantial testimony, corroborated in large part, shows the contrary.

As a simple illustration of arts: it has often been disclosed that many preliminary conversations, faulty interpretations, faulty hearing of reporters, with advice given, and side remarks before and during Board hearings, are not reported in the record; and when the plaintiff in this case, who testified that he could scarcely read any part of a newspaper and had no knowledge of or interest in any, was asked what newspapers were published in the city of Chihuahua and is shown to have answered with apparent prompt understanding the names of three dailies, and when asked which he had read answered "the 'El Heraldo' ", it is a matter which the Board's record would not likely show if three papers had been shown to him for inspection by some person before the hearing and he was asked to read from the 'El Heraldo".

The plaintiff was on the witness stand here for about three hours endeavoring to understand and answer questions which might have been answered in an hour or less. His lack of understanding was about the same on direct as upon cross-examination. I formed the belief from watching him closely that he was trying his best to answer honestly, although at times he was considerably confused and faltered in uncertainty, and his attitude showed no marks of dishonesty but of extreme ignorance and considerable embarrassment arising from it.

It may be true that he heard of the war before 1946, but if so, such information did not impress him as being any concern of his and he had forgotten when or how he first heard of it. He had been taken from the United States when an infant of three years and thereafter kept in poverty and ignorant surroundings generally in the country districts in Northern Mexico. His mother became very ill in 1944 or thereabouts and remained ill following a severe abdominal operation for about a year, during which time he had to remain at home with his sick mother and take care of three younger children in the family; then he became afflicted with an eye disease (tracoma) and was practically blinded for some months.

I believe his testimony that he knew nothing of a Presidential proclamation in October 1943 requiring all citizens of the age of eighteen or over residing in foreign countries to present themselves to the nearest American Consulate to register for military service.

He knew, from his parents, that he was an American citizen, and was proud of it, and yearned from the time he was seventeen years old to come to the United States and better his opportunities in life. He appears capable of learning, has always been dutiful to his parents and other authority, has a good strong body, honest face, and an earnest desire to improve his position. If there was an uncertainty in my mind, which there is not, that he intentionally did something which in law might destroy his American citizenship, or knowingly refused to do a thing which was necessary to preserve it, I should feel it a painful duty to condemn this boy to return to a life of torturous misery in the ignorance and poverty of the neighborhood in which he was reared. I am glad that he made a case strong enough to convince me that his remaining in Mexico was not wilful, or in any sense for the purpose of avoiding service in the armed forces during the war.

I find for the plaintiff and order his citizenship in the United States restored.