**YAM SANG KWAI, Petitioner,**

v.

**IMMIGRATION & NATURALIZATION SERVICE, Respondent.**

**No. 21784.**

United States Court of Appeals District of Columbia Circuit.

Argued Oct. 21, 1968.

Decided Feb. 17, 1969.

J. Skelly Wright, Circuit Judge, dissented.

14. *See* Fryer v. United States, *supra* note 5.

Mr. Jack Wasserman, Washington, D. C., for petitioner.

Mr. Charles Gordon, General Counsel, Immigration & Naturalization Service, of the bar of the Supreme Court of the United States, pro hac vice, by special leave of court, with whom Messrs. David G. Bress, U. S. Atty., and Frank Q. Nebeker, Asst. U. S. Atty., were on the brief, for respondent.

Before WRIGHT, MCGOWAN and TAMM, Circuit Judges.

TAMM, Circuit Judge.

At about 6:00 p. m. on the evening of October 12, 1967, petitioner's place of business was surrounded by officers of the respondent with the purpose of interrogating any aliens therein. Certain officers were stationed at both the entrance and the exit. None knew of the petitioner's existence nor of the identity of any of the patrons before entering. One officer, Officer Podrasky, entered the restaurant and confronted the petitioner with certain questions concerning petitioner's right to be in the United States. Because of a language difficulty petitioner (being able to converse solely in Chinese—Foochow dialect) sent for a

friend to act as an interperter. It should be noted that Mr. Kwai's "friend," a Mr. Lang Young, is a China-born, United States citizen having resided in this country since 1941. Mr. Young, although not a professional interpreter, certified that he had received an eighth grade education in China and that he was a qualified interpreter of Chinese—Foochow dialect. From the moment of his arrival at his friend's restaurant, he was present throughout all the proceedings here at issue up to, and including, the hearing before the Special Inquiry Officer. While waiting for Mr. Young, the petitioner went about his business of preparing food and managing his carryout shop. When the friend arrived the petitioner produced certain documents and gave them to Podrasky. One document was an order of supervision, the other, a warrant of arrest. The order of supervision (which it appears that petitioner was holding for a friend) was in the name of Yung Ing Wa. The warrant of arrest, in the name of Yam Sang Kwai, indicated that it had been issued in August, 1965, by the District Director of the New York District but had not yet been executed. However, a copy of this warrant was attached to the Service's case jacket and it reveals that the warrant was executed November 17, 1965. In that the documents conflicted as to the person named thereon and, as Podrasky did not know which document referred to the petitioner, he required the petitioner to close his restaurant and accompany him to his office. Here he was advised of his rights under Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and was sworn upon an affidavit in which he related his present status as an alien; to wit, that he was born on May 5, 1928, in Foochow, China; he is a citizen of China; he had previously been deported from the United States on November 17, 1965; he had not reapplied for admission after that date; he was not granted permission to re-enter the United States; and that he had attempted to re-enter the United States, at Philadelphia, on September 20, 1966—refused entry, and entered the United States on September 26, 1966, at New York City. This affidavit was read to petitioner by his friend, Mr. Young. At 8:00 p. m. Mr. Kwai was served with a warrant of arrest and an order to show cause why he should not be deported. A hearing was held on October 23, 1967, on the order to show cause which charged the petitioner with having entered the United States at Philadelphia, Pennsylvania on September 20, 1966, and that he was subject to deportation on the basis that he had previously been deported and had not received permission from the Attorney General to re-enter.

At the hearing petitioner was represented by experienced counsel. A motion was made to suppress petitioner's affidavit and denied by the Special Inquiry Officer. Petitioner, upon advice of counsel, elected to remain mute. Evidence was presented showing that petitioner had previously been deported in 1965, that he sought entry at Philadelphia on September 20, 1966, and was denied, and that he re-entered the United States at New York City on September 26, 1966, without permission. At the close of the evidence the Special Inquiry Officer, prior to issuing his order, suggested that the government move to amend the order to show cause to conform with the proof. Counsel for petitioner noted that he was entitled to an adjournment in this regard. An adjournment was offered but waived by counsel, an objection to the amendment being retained. "The special inquiry officer shall advise the [petitioner] * * * that he may have * * * time within which to meet the additional * * * allegations. The [petitioner] shall be required to state *then and there* whether he desires a continuance. * * *" (Emphasis supplied.) 8 C.F.R. § 242.16 (d) (1968). The motion to amend was made and granted. The order of deportation entered.

The petitioner appealed this ruling to the Board of Immigration Appeals and on March 19, 1968, they dismissed the appeal on the grounds that there was a waiver of written notice to make the amendment to the order to show cause

since counsel had waived adjournment in that regard; that, based upon the conflicts in the two documents which petitioner had given Podrasky, the officers were justified in arresting petitioner at the restaurant without a warrant; and that the motion to suppress petitioner's affidavit was properly denied. This appeal followed. We affirm.

The central question on this appeal is whether there was a valid arrest of the petitioner at the restaurant. In determining that issue there is one point over which there can be no dispute; that is, that *prior* to confronting petitioner in in the restaurant there was no probable cause (under applicable standards as applied to the statute under which respondent must act) to arrest anyone. Since we hold that there was a valid arrest at the restaurant, what transpired prior to entering becomes critical.

■ It is the petitioner's contention that his initial arrest was effected at the time the restaurant was surrounded and his liberty of movement constrained. We cannot agree. "It is quite plain that the Fourth Amendment governs 'seizures' of the person which do not eventuate in a trip to the station house and prosecution for crime * * *. It must be recognized that whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person * * *." Terry v. Ohio, 392 U.S. 1, 16, 88 S.Ct. 1868, 1877, 20 L.Ed.2d 889 (1968). Thus the Supreme Court has verbally circumscribed the outer limits of "seizure" under the fourth amendment to mean an accosting of an individual *and* a restraint of his liberty to depart. We take this to mean that a "seizure" must be personal, not general; that it must contain the element of awareness on the part of both the protagonist and the antagonist; and it must restrain the liberty of the individual to the extent that he is not free to leave. An arrest, under the fourth amendment, cannot be effected in a vacuum. There must be knowledge of the situation on behalf of both the police and the suspect. There can be no seizure where the subject is unaware that

he is "seized." To hold otherwise would be to give substance to an *ex parte* arrest —a concept we must disregard. At no time, prior to entering the restaurant, does the record indicate that any of the patrons of the restaurant was aware of what was transpiring in the street outside. The fact that they *might* have been stopped had they attempted to leave is not before us. The Supreme Court has said that "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen [or alien] may we conclude that a 'seizure' has occurred. * * * " (Brackets supplied.) Terry v. Ohio, *supra*, at 19, 88 S.Ct. at 1879, n. 16. Suppose, for example, that word of a gambling operation is received by a police officer and, with the aid of his fellows, he closes off both the entrances and exits to that building housing the operation—can it be argued, as the petitioner argues here, that should that activity be in the basement of this very courthouse, each member of the judiciary, herein, is under arrest? Yet this is the very point the petitioner seeks to make. He urges that, prior to any personal confrontation and absent any personal awareness on his part of the existence of the respondent's officials, he was under arrest. If this be true then perhaps as one sits reading this opinion in the quiet of his office he may be unknowingly under arrest. Such a contention is both chilling in its implication and absurd in its application. We therefore disregard it.

■■ Petitioner next contends that probable cause to arrest did not exist even after the production of the conflicting documents. We cannot agree. "Any officer * * * of the Service * * * shall have power without warrant * * * to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States * * *." 8 U.S.C. § 1357(a) (1) (1964). This statute, plain on its face, gives the officers of the respondent the authority to interrogate *any* alien as to his right to be in the United States. It does nothing

more. It does not authorize interrogation of the alien concerning criminal matters, nor does it condone harassment. Officer Podrasky, upon entering the carryout, confronted the petitioner, Yam Sang Kwai, obviously a person of foreign descent, with questions concerning his right to be in the United States. Due to a language barrier the petitioner sent for a friend to act as an interpreter and, while waiting for him, proceeded about his business unimpaired by Podrasky. There can be no question that at this point the respondent's officer acted "reasonably" in light of his statutory authority and fourth amendment dictates. When the interpreter arrived Podrasky again inquired into petitioner's status. In reply, the petitioner produced the conflicting documents. At this point Podrasky "didn't know who [he] had," and "because of [petitioner] furnishing [Podrasky] with these two pieces of paper, [Podrasky] thought that he was likely to abscond" (Tr. 11). Podrasky then requested the petitioner to accompany him to his offices. Again respondent's officer acted within his statutory authority for he is enabled "to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of * * * law * * * and is likely to escape before a warrant can be obtained * * *." 8 U.S.C. § 1357(a) (2) (1964). An apt analogy to the present issue would be where a patrolman stops a vehicle upon a traffic violation, receives conflicting documents as to the identity of the driver and thereby is given probable cause for believing that the driver has no right to be in that vehicle. We have the same situation here. The production of these documents and the facts available to Podrasky certainly would "warrant a man of reasonable caution in the belief"[1] that the petitioner was in the United States illegally and that he was likely to abscond. The arrest at the restaurant was valid. Our construction of the respondent's activities in no way vitiates the legal necessity of "probable cause"

to make an arrest. We find that probable cause existed upon the receipt of the documents. This finding precludes a discussion of the suppression issues in that the evidence secured by Podrasky was incident to a lawful arrest.

We turn then to the issue of whether the petitioner's affidavit was properly admitted. It is the contention of the petitioner that since the interpreter was not "qualified" by legal standards, his waiver of rights under *Miranda* was ineffective. We cannot agree. Mr. Young was a friend of the petitioner and acted in his behalf. He had been a resident in the United States since 1941. He certified that he had read the affidavit to the petitioner and that the petitioner understood him and that the statements made therein were true and correct, and he was present at the inquiry. At no time has the petitioner ever alleged that he did *not* understand his affidavit. Petitioner cites Nieto v. McGrath, 108 F. Supp. 150 (S.D.Texas 1951); Ponce v. McGrath, 91 F.Supp. 23 (S.D.Cal.1950) and Handlovits v. Adcock, 80 F.Supp. 425 (E.D.Mich.1948) in support of his position. A reading of these cases uncovers differences of fact, not of law and therefore are not applicable here. We hold there was a valid waiver of counsel and petitioner's affidavit was properly admitted.

We consider the argument of petitioner that the order to show cause was improperly amended. We cannot agree. The proceeding before the Special Inquiry Officer is essentially civil in nature. It does not take on the rigid formalities of a criminal trial. The order to show cause is not substantive evidence but a procedural safeguard with which the petitioner is notified of the charges against him in order properly to defend the allegations. Here petitioner was the best qualified person to know when he re-entered the United States and what his prior history before the Service had been. The action of the Special Inquiry Officer was to correct procedural error

---

1. Carroll v. United States, 267 U.S. 132, 162, 45 S.Ct. 280, 288, 69 L.Ed. 543 (1925).

and not an attempt to abridge substantive rights. An adjournment was offered to trial counsel in this regard but was waived—counsel retaining a token objection. We see no error on the part of the Special Inquiry Officer in this regard.

Since oral argument of this case, petitioner has filed certain supplemental memoranda. We find nothing contained therein persuasive on the issues.

It is petitioner's position that the Board of Immigration Appeals must be reversed. We cannot agree.

Affirmed.

McGOWAN, Circuit Judge (concurring in the result):

For the reasons stated hereinafter, I join in the result of leaving the deportation order undisturbed.

The evils of the dragnet detention for investigation in any area of law enforcement are always a legitimate area of judicial concern. But that concern may more properly be pursued at the instance of one who has clearly been detained against his will. In this case appellant did not unsuccessfully try to leave the premises. Nor does it appear that appellant was the unwilling object of a forced submission to questioning. He did not testify that he was, either by reference to the representations or conduct of the investigator who came into his restaurant, or otherwise.

The dissent argues that, because of the presence of investigators outside the restaurant, appellant was in fact such an unwilling object, although he may not have thought himself to be one at the time. All the record shows on this is that the questioning inspector, when asked whether appellant was free to leave, said "I don't know." For me there is less ambiguity in this answer than meets the eye, because it must be true that the manner of response to a question to an alien about his status can determine whether he may be detained.

If appellant here had, in response to the first request for information about

his status, said that he would respond as soon as he completed some chore in the kitchen, and then had run out the back door with every appearance of a man permanently retiring from the restaurant business, it seems clear that the questioning investigator, if fleet enough to catch up with him, would have had either a reasonable suspicion adequate to detain him for further questioning or perhaps even probable cause to arrest for being in the country illegally. The mere fact that the questioning investigator does not rely on his own ability to deal with this contingency, but instead brings along colleagues who stay outside to provide help if needed, does not without more make the approach inside the restaurant an unreasonable seizure of appellant's person within the meaning of the Fourth Amendment, at least where as here there is no indication from the record the appellant even knew of the presence of officers outside.

In terms of what actually happened inside the restaurant, the record shows only that appellant was asked to supply information about his status, and that his manner of response was completely cooperative. While waiting for his interpreter-friend to arrive, appellant was allowed freely to go about his business, including unsupervised trips to the kitchen. When communication was established, he promptly produced documents which, at the least, justified detaining him for further inquiry. I am unprepared to say that, on this record, the mere presence, unknown to appellant, of investigators outside the restaurant effected forthwith an unreasonable seizure of his person.

Appellant here does not challenge the right in the questioning investigator to approach him in the first place, although the statute is in terms limited to the interrogation of "any alien or person believed to be an alien." This limitation could obviously raise problems for a dragnet detention. Moreover, the "routine search" characterization used by the Government could certainly stand some ventilation in a case involving persons who have clearly felt its impact. Also,

I share the view that there has emerged, at least in the field of familiar criminal acts, an important and discernible distinction between arrest on probable cause, and temporary detention for interrogation, with both concepts in particular applications being subject to assay under the Fourth Amendment.

I am not in a position to say, on the basis of what this record tells me, that the Congressional grant of authority to interrogate aliens about their status must be construed as limited to reasonable suspicion for believing that the person approached is illegally in the country. There may, for all I know, be cases of illegal entry where the enforcement authorities have no way of proceeding effectively except by the direct inquiry approach to those who reasonably appear to be aliens. The constitutional issues involve, as the dissent asserts, the balancing of interests in privacy with the needs of law enforcement. This record has not seemed to me an appropriate one for the accomplishment of this delicate undertaking, especially when the only apparent analogies are those of inquiry to see whether a man is about to commit burglary, Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), or has allowed his plumbing to get into a state of disrepair, Camara v. Municipal Court, 387 U.S. 523, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967).

J. SKELLY WRIGHT, Circuit Judge (dissenting):

Petitioner has been ordered deported to Hong Kong, and seeks review of that order under the appropriate provisions of the Immigration and Nationality Act.[1] Because in my view the finding of deportability was based in part upon the fruit of an illegal seizure of petitioner's person, I would set the order aside.

**I**

Petitioner owned and operated a restaurant in the District of Columbia. On the evening of October 12, 1967, four investigators of the Immigration and Naturalization Service went to petitioner's restaurant in order to carry out what is described as a "routine search operation." Two of the investigators were stationed at the rear door, one at the front door, and the fourth entered the front door. No exits to the streets remained unguarded.

The fourth investigator attempted to question petitioner, but language difficulty apparently made communication impossible. Petitioner then sent for a friend to act as intepreter. The investigator waited, while petitioner continued to work in the kitchen. After the investigator spoke with petitioner through the interpreter, petitioner produced two documents. One was an unexecuted warrant for the deportation of petitioner, and the other was an order of supervision (a document applicable to one subject to deportation) in the name of Yung Ing Wa.

At this point the investigator asked petitioner to accompany him to the I&NS office, and told him to close his restaurant for the night. Petitioner went to the office where, after receiving a version of the *Miranda* warnings,[2] he admitted that he was an alien, that he had previously been deported from the United States, and that he had re-entered the country by jumping ship, without previously applying for admission into the United States. On the basis of the documents supplied to them at the restaurant, the investigators obtained petitioner's I&NS file, which contained the executed

---

1. 8 U.S.C. § 1105a (1964).

2. The I&NS has adopted the standards of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), in interrogating *persons held in custody* during the investigative stage of deportation proceedings. *See* 1 C. GORDON & H. ROSENFIELD, IMMIGRATION LAW AND PROCEDURE (Rev. ed.) § 5.2b (1967 Cum. Supp.); Memorandum for Respondent in Opposition to Granting Petition for Writ of Certiorari in Ah Chiu Pang v. Immigration and Naturalization Service, 3 Cir., 368 F.2d 637 (1966), *cert. denied*, 386 U.S. 1037, 87 S.Ct. 1490, 18 L.Ed.2d 601 (1967).

warrant directing his earlier deportation, and a form indicating that he had been excluded from entry into the country at Philadelphia shortly before he, according to his admission, jumped ship in New York.

At the subsequent deportation hearing, the Government submitted into evidence petitioner's statement, the executed warrant of deportation, and the form showing that he had been excluded from entry at Philadelphia. On the basis of these items and the testimony of the investigator who had questioned him at the restaurant, petitioner was found to be an alien previously excluded and deported, who had not applied for admission to the United States.[3] He was ordered deported.

At the deportation hearing petitioner's counsel objected to the admission into evidence of the statement made at the I&NS office, on the ground that it was the fruit of an illegal arrest. The objection was overruled. In reviewing the order of deportation, the Board of Immigration Appeals upheld the admission of the statement, and relied on it to affirm the order. In my view the statement was the fruit of an illegal seizure of petitioner's person, and should not have been admitted.

When the four I&NS investigators proceeded to petitioner's restaurant, they had no knowledge of who petitioner was, whether he was an alien, or whether he was illegally in the United States. They were admittedly engaged in a "routine search operation." Before any of them entered the restaurant, they staked out its public exits. Then one of them entered and started asking questions. Petitioner contends that surrounding the building and sending an officer in to interrogate those inside constituted an arrest without probable cause, any fruits of which cannot be used in evidence.

The Government in its brief describes the initial contact with petitioner as follows:

"* * * Two of the investigators were posted at the rear door of the restaurant for the obvious purpose of preventing the escape of aliens illegally in the United States. It has been the experience of the Service that if an immigration officer enters a restaurant, word of his presence is quickly spread throughout the restaurant and illegal aliens seek to flee through doors or windows of the restaurant. Investigator Podrasky entered the restaurant and left another investigator outside the front door. Podrasky attempted to query the petitioner concerning his immigration status which he had the right and duty to do under * * * 8 U.S.C. 1357(a) (1), and this Court has held that the mere questioning of a suspect does not amount to an arrest. Green v. United States, 104 U.S.App. D.C. 23, 259 F.2d 180 (1958). * * "[4]

The Government thus does not attempt to characterize the investigator's action as a simple exercise of one individual's right to ask another individual a question in a public place, at the risk of having

3. The statutory basis for petitioner's deportation is 8 U.S.C. § 1251(a) (1) (1964), which provides:

"Any alien in the United States (including an alien crewman) shall, upon the order of the Attorney General, be deported who—

"(1) at the time of entry was within one or more of the classes of aliens excludable by the law existing at the time of such entry[.]"

The Government charged that petitioner was excludable at the time of entry by virtue of 8 U.S.C. § 1182(a) (16) (1964), which provides:

"Except as otherwise provided in this chapter, the following classes of aliens shall be ineligible to receive visas and shall be excluded from admission into the United States:

* * * * *

"(16) Aliens who have been excluded from admission and deported and who again seek admission within one year from the date of such deportation, unless prior to their reembarkation at a place outside the United States or their attempt to be admitted from foreign contiguous territory the Attorney General has consented to their reapplying for admission[.]"

4. Brief for Respondent, pp. 7–8.

the other individual choose to answer or walk away.[5] It rather regards the action as something requiring authorization, and it seeks that authorization in 8 U.S. C. § 1357(a) (1) (1964), which provides:

> "Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power *without warrant*—
>
> "(1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States[.]" (Emphasis added.)

If this provision is anything more than an empty recitation of the right of a Government agent to ask an individual a question, it must be taken as an authorization of temporary or limited detention for the purpose of interrogation. The express provision eliminating the need for a warrant lends weight to this reading. Congress would not have suggested that a warrant might be needed for questioning unless it had regarded some form of search or seizure as an adjunct to such questioning.

The Government's explanation of the posting of investigators at the exits to the restaurant fully confirms that the I&NS views its statutory power to interrogate as a power to detain for interrogation. The Government brief asserts that, when I&NS investigators enter restaurants, persons "flee" through windows and doors. Officers are posted at such exits, then, to prevent such "escapes"—to detain the persons in the restaurant so they may be questioned about their immigration status. Since such "escapes" apparently take place before the investigator inside has time to ask questions and hence to focus on suspects, the purpose of the investigators at the exits is not simply "to prevent the escape of illegal aliens," but to prevent the departure of all persons who might turn out to be illegal aliens after interrogation.

The Government cites the *Green* case for the proposition that "the mere questioning of a suspect does not amount to an arrest."[6] With that proposition I have no argument. But what distinguishes "mere questioning" from detention for interrogation is that the person subjected to "mere questioning" is free to depart at any time. Here the Government has made no effort to rebut the natural inference, arising from the posting of officers at all public exits, that the persons in petitioner's restaurant were *not* free to depart. Indeed the Government asserts that those officers stood at the doors to prevent "escape"—a tendentious term which in the circumstances can mean little more than "departure."

Petitioner did not seek to leave, nor was he restrained from continuing with his work in the kitchen while the interpreter was sent for. Neither of these facts rebuts the proposition that he was detained. A man may be in custody without testing the bounds of that custody. A man may be free to move within a small area, but if he is restrained from going where otherwise he would have a right to go his liberty of movement is restricted.

Finally, the record does not explicitly show that petitioner was aware that officers were posted at the doors of his restaurant. On the other hand, nothing in the record suggests that he suffered the illusion that he could leave without being accompanied by the interrogating officer. Where, as here, the objective circumstances indicate that the officers were operating under apparent statutory pow-

---

5. *See* Terry v. Ohio, 392 U.S. 1, 32–33, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (concurring opinion of Mr. Justice Harlan).

6. In *Green*, police officers called two men over to their police car for questioning. One of the men came, but the other fled into a nearby house, over the protest of the occupant of the house. The police arrested him for attempted unlawful entry, and this court held that they had probable cause for such an arrest. In the circumstances, asking the men to come to the police car was held not to constitute an arrest. Green v. United States, 104 U.S.App.D.C. 23, 259 F.2d 180 (1958), *cert. denied*, 359 U.S. 917, 79 S.Ct. 594, 3 L.Ed.2d 578 (1959).

er to detain for interrogation, I cannot assume that the person detained did not know he was detained. Nor is it true that Fourth Amendment protections extend only to persons who know they have been seized by the authorities. An unconscious or feeble-minded person may in fact be arrested without knowing it; that does not mean that evidence obtained in such an arrest is not subject to exclusion where the arrest is made without probable cause. In view of all the circumstances, I think that the officers had petitioner in limited custody when one of them entered the restaurant to question him, and that their action was subject to "[t]he right of the people to be secure in their persons * * * against unreasonable * * * seizures * * *." U.S.Const., Amend. 4.

## II

With that constitutional right in mind, I would construe 8 U.S.C. § 1357(a) (1) differently from the majority in the context of this case. The statute authorizes interrogation "without warrant" of "any alien or person believed to be an alien as to his right to be or to remain in the United States." As I have argued, the statute, unless viewed as superfluous, must be read to permit detention of persons for such interrogation in some cases. But as the Supreme Court has recently recognized, not all detentions of individuals amount to arrest, nor need they all be premised upon the "probable cause" traditionally required for arrests. Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). Rather, where the seizure of a person is undertaken without probable cause, courts must balance "the need to search [or seize] against the invasion which the search [or seizure] entails," id. at 21, 22–27, 88 S.Ct. at 1879, in order to determine whether the search or seizure was reasonable.

In making this inquiry, I would not place too much emphasis on the clumsy and often artificial distinction between criminal and civil proceedings. The Fourth Amendment protects the security of the people against improper official invasion, not merely the security of criminal defendants. As the Supreme Court has recently noted: "It is surely anomalous to say that the individual and his private property are fully protected by the Fourth Amendment only when the individual is suspected of criminal behavior." [7]

I turn then to an examination of the competing factors as delineated by the Supreme Court: the "need to search [or seize]" and the "invasion which the search [or seizure] entails." With respect to the former, the Government has a legitimate interest in the enforcement of its immigration and nationality laws. It must take steps to insure that only those aliens are in this country whom Congress has said may be here. Enforcement of these laws doubtless requires affirmative investigation for possible violation of them. Since the presence of illegal aliens in the country may not injure or even come to the notice of the general citizenry, reliance on private complaints might permit such aliens to remain indefinitely.

However, it should be noted that analogous difficulties attend the enforcement of laws defining crimes which have no obvious victims—gambling, narcotics and sex laws, for example. And no one will contend that the public interest in the enforcement of the criminal law is less pressing than the interests protected by the immigration and nationality laws. Yet one would be hard put to argue that the Fourth Amendment requirement of particular grounds for suspicion of wrongdoing should be suspended in the enforcement of laws against crimes without victims.

Against the governmental interest in making the seizure, courts must balance its intrusiveness into "the privacy and security of individuals." Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 528, 87 S.Ct.

7. Camara v. Municipal Court of City and County of San Francisco, 387 U.S. 523, 530, 87 S.Ct. 1727, 1732, 18 L.Ed.2d 930 (1967).

1727, 1730, 18 L.Ed.2d 930 (1967). In *Camara* the Court sanctioned area-wide inspection of houses for health and safety defects, noting that "a routine inspection of the physical condition of private property is a less hostile intrusion than the typical policeman's search for the fruits and instrumentalities of crime." *Id.* at 530, 87 S.Ct. at 1731.[8] Housing inspections are imposed upon all occupants of dwellings; thus there is no stigma in being subject to one. Nor do they typically induce fear in those whose property is inspected; violations discovered usually lead to nothing worse than a warning to correct them. The limited nature of the intrusion into "privacy and security" thus justified a less particular factual basis for making the inspection.

Contrast this with the intrusion involved in an I&NS officer's interrogation of an alien. Such an interrogation can bear only one implication for the alien, his family, and his employer—he is suspected of illegal presence in the country. The interrogating officer carries with him the sanction of immediate deportation, a sanction often indistinguishable from criminal punishment in the shame and distress it brings upon those subjected to it. And often, as indeed in the case before us, immigration law violations are crimes as well as grounds for deporta-

tion.[9] Thus while a detention for interrogation may be less intrusive than a full arrest—and hence subject to a lower standard than full probable cause—it is analogous to the kind of on-the-street investigation of criminal suspects sanctioned by the Supreme Court in Terry v. Ohio, *supra*.

Thus *Terry* gives appropriate indication of the factual basis required to support a limited detention of an alien for the purpose of pursuing suspicions concerning his immigration status. In *Terry* police stopped for questioning two individuals who had been observed to walk by a shop window and look it over at least a dozen times apiece, and to confer together on the street corner between those sorties. While the Court did not explicitly approve of a forcible stop of these individuals for questioning, it did permit the observing policemen to precede a brief on-the-street interrogation with a limited frisk of the person.[10]

In a companion case to *Terry*, Sibron v. New York, 392 U.S. 40, 88 S.Ct. 1912, 20 L.Ed.2d 917 (1968), an officer observed an individual over an eight-hour period, during which time he spoke to six or eight known narcotics addicts. When the officer approached the suspect to question him, the suspect reached in his pocket. The officer immediately thrust his hand in the suspect's pocket, and

8. The central thrust of *Camara* was to overrule the holding of Frank v. Maryland, 359 U.S. 360, 79 S.Ct. 804, 3 L.Ed. 2d 877 (1959), and to require that health inspectors obtain a warrant before entering private dwellings without the consent of the occupant. But the Court also rejected the contention that such civil warrants could only issue upon a showing of probable cause that a housing code violation existed within the dwelling. The Court concluded that "area inspection is a 'reasonable' search of private property within the meaning of the Fourth Amendment," and hence that " 'probable cause' to issue a warrant to inspect must exist if reasonable legislative or administrative standards for conducting an area inspection are satisfied with respect to a particular dwelling." 387 U.S. at 538, 87 S.Ct. at 1735.

9. 8 U.S.C. § 1326 (1964).

10. The majority of the Court in *Terry* avoided, as not squarely presented, the question whether the suspicious behavior of the petitioner justified the police officer's forcibly detaining him on the street for questioning. 392 U.S. at 19, n. 16, 88 S.Ct. 1868. The holding was merely that when the officer approached petitioner to question him it was reasonable to frisk him in order to safeguard against an armed attack. Justices Harlan and White in concurring opinions would have made clear that circumstances which justify a limited search of the person cannot fail also to justify a forcible stop for interrogation; in short, that the right to frisk only exists where there is a right to stop. 392 U.S. at 32–33, 34, 88 S.Ct. 1868.

found envelopes containing heroin. Applying the standards established in *Terry*, the Court found that this limited intrusion was *not* justified by the facts known to the officer at the time.

The general standards employed by the Court to decide these cases are, I believe, useful here. The Court emphatically condemned "intrusions upon constitutionally guaranteed rights based on nothing more substantial than inarticulate hunches." Terry v. Ohio, *supra*, 392 U.S. at 22, 88 S.Ct. at 1880. Further, it insisted that "in justifying the *particular* intrusion the police officer must be able to point to *specific* and articulable facts which taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21, 88 S.Ct. at 1880. (Emphasis added.) Thus general or class suspicion is not sufficient; rather the officer must be able to point toward elements of the particular situation which raise a reasonable suspicion of violation of the law.

Here there is no intimation that the I&NS officers had any particular grounds for suspecting that anyone was violating any laws when they surrounded and entered petitioner's restaurant. They were engaged in a "routine search operation." They knew only that they were investigating a Chinese restaurant. We entirely ignore the letter and spirit of the Fourth Amendment when we sanction detention of an individual for interrogation by law enforcement officers on grounds no more substantial than the ethnic character of his restaurant or his own apparent race or national origin. Thus under the duty of the courts to construe federal statutes subject to constitutional standards, I would hold that the power granted by 8 U.S.C. § 1357(a) (1) to detain for interrogation "any alien or person believed to be an alien" should be limited to cases where officers have particular grounds to support a reasonable suspicion that the person detained is illegally in the country. Since no such ground was shown in this case, I believe that petitioner was illegally detained in his restaurant during the interrogation.

Petitioner's inculpatory statement was unquestionably the fruit of the interrogation at the restaurant. The interrogation elicited the two documents, which in turn led the I&NS investigator to take petitioner to the office, where he made the statement which was received at the hearing.

It is well established that statements, as well as items of tangible evidence, which are the fruits of an illegal search or seizure cannot be admitted into evidence.[11] And the exclusionary rule bars illegally seized evidence from deportation hearings as well as from criminal trials.[12] Thus in my view petitioner's inculpatory statement, labeled Exhibit 2 in the I&NS proceedings, should not have been admitted into evidence.

I believe that the admission of petitioner's inculpatory statement into evidence was not only error, but was prejudicial. In the statement petitioner admitted all the elements establishing his deportability: that he was an alien, that he had previously been deported and excluded, that he had not subsequently applied for admission into the United States, and that he had then entered the United States.[13] The other evidence against petitioner consisted of a copy of the executed warrant for his previous deportation, and a notation of his subsequent exclusion from the country at Philadelphia.

The Government has relied upon Klissas v. Immigration and Naturalization Service, 124 U.S.App.D.C. 75, 361 F.2d 529 (1966), for the proposition that "the validity of a deportation order will be

11. Wong Sun v. United States, 371 U.S. 471, 485, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963).

12. Klissas v. Immigration and Naturalization Service, 124 U.S.App.D.C. 75, 361 F.2d 529 (1966) ; Bong Youn Choy v. Barber, 9 Cir., 279 F.2d 642 (1960) ; *cf.* United States ex rel. Bilokumsky v. Tod, 263 U.S. 149, 155, 44 S.Ct. 54, 68 L.Ed. 221 (1923).

13. See Note 3, *supra*.

sustained notwithstanding an illegal arrest, if the order is supported by substantial evidence free of taint." [14] In *Klissas* the petitioner was deported on two separate charges: overstaying his admission as an alien seaman, and failing to submit address reports as required by law. The I&NS found him deportable on both counts. The tainted evidence in that case was relied on largely in establishing the first ground for deportation. The failure to submit reports was established by the petitioner's own admission, made some two and a half years after the improper arrest, that he had not complied with the applicable requirement. The court found that admission not to be the fruit of the illegal arrest.

Here petitioner has been ordered deported on a single charge: that he re-entered the country after being deported. The record shows that both the I&NS special inquiry officer and the Board of Immigration Appeals relied heavily upon petitioner's admission in upholding that charge. The case thus resembles Bong Youn Choy v. Barber, 9 Cir., 279 F.2d 642 (1960). In *Bong Youn Choy* an alien was ordered deported on the basis of three statements he had made indicating that he had been a member of the Communist Party. The court found that one of the statements had been obtained by coercion. Noting that "[t]he special inquiry officer * * * placed great weight on the [improperly obtained] statement," the court concluded that "[w]e cannot say whether or not, without it, the special inquiry officer would have concluded as he did," and set aside the deportation order. 279 F.2d at 647.

In *Bong Youn Choy* the determination of Communist Party membership involved conflicting testimony, whereas here petitioner stood mute at his hear-ing and offered no evidence in his behalf. On that ground the cases may be distinguishable. But here petitioner's admission was the chief item relied upon by the administrative agency in making its findings. I cannot conclude that the other evidence in the record provides the "clear, unequivocal, and convincing" proof necessary to support an order of deportation. *See* Woodby v. Immigration and Naturalization Service, 385 U.S. 276, 286, 87 S.Ct. 483, 17 L.Ed.2d 362 (1966).

In declining to vote for affirmance on the basis of the untainted evidence in the record, I am influenced by the nature of the error which in my view was committed. Petitioner's Fourth Amendment rights were violated. The exclusionary rule, as applied to evidence obtained through illegal searches and seizures, is designed primarily to deter improper official conduct. That purpose is not served if the courts too readily find that the introduction of such evidence is harmless error. The Supreme Court has recently taught us that where constitutional error is committed in a criminal trial, the state must "prove beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained." Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705, 828 (1967). The rule was obviously fashioned with jury trials in mind, and it may be that it does not apply with full rigor to deportation hearings. However, it expresses the principle that error in proceedings affecting the personal liberty of individuals cannot lightly be assumed not to have affected the outcome of those proceedings. With that principle in mind, I believe that the order of deportation against petitioner should be set aside.

I respectfully dissent.

14. Brief for Respondent, p. 7.