AU YI LAU, Yim Tsz Ki *, Lam Sai Ting, Petitioners,

v.

UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

TIT TIT WONG and Nei Ngan Chan, Petitioners,

v.

UNITED STATES IMMIGRATION AND NATURALIZATION SERVICE, Respondent.

Nos. 23339, 23527.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 15, 1970.

Decided March 19, 1971.

* Opinion and Judgment Vacated as to Yim Tsz Ki, July 8, 1971.

Certiorari Denied Oct. 12, 1971. See 92 S.Ct. 64, 66.

Mr. David Carliner, Washington, D. C., for petitioners.

Mr. Charles Gordon, General Counsel, Immigration and Naturalization Service,

of the bar of the Supreme Court of the United States, pro hac vice, by special leave of the court, with whom Messrs. Thomas A. Flannery, U. S. Atty., and John A. Terry, Asst. U. S. Atty., were on the brief, for respondent. Mr. Paul C. Summitt, Atty., Department of Justice, also entered an appearance for respondent.

Before FAHY, Senior Circuit Judge, and McGOWAN and LEVENTHAL, Circuit Judges.

McGOWAN, Circuit Judge:

These two statutory review proceedings, although not consolidated in this court, were argued together and are suitable for disposition by one opinion. They involve deportation orders issued, after evidentiary hearings, by a Special Inquiry Officer of the Immigration and Naturalization Service (INS), which were affirmed by the Board of Immigration Appeals. Our review is circumscribed by the Congressional commands that it be limited to the administrative record, and that findings of fact therein be taken as conclusive "if supported by reasonable, substantial, and probative evidence on the record considered as a whole." 8 U.S.C. § 1105a. There is no issue in either case as to the adequacy of the evidence upon which the orders rest. The claim in each is, rather, that the evidence was the fruit of an illegal arrest. We look first to the factual circumstances from which each of these contentions derive.

I

No. 23,339

Petitioners in this case are three Chinese seamen who are charged with deserting their ships in American ports. On October 31, 1967, immigration officers at the Washington, D. C., field office received an informant's tip that aliens unlawfully in this country were working in a restaurant located in the downtown area which had been under periodic surveillance by the Washington immigration office for the preceding year. In response to this tip, some seven of the officers walked to the restaurant, which was a few blocks from their office. They had no warrants because they lacked information of the requisite degree of specificity.

Upon their arrival, some of the officers stationed themselves at the main exits of the restaurant. Three of the officers entered the restaurant by way of the front entrance, and spoke to the assistant manager who was in charge at the time. They identified themselves, told him the purpose of their visit, and asked his permission to enter the restaurant in order to talk to the employees. The assistant manager agreed to their coming into the restaurant, but there was some disagreement as to whether he permitted them to conduct their investigations in the kitchen. The Board of Immigration Appeals accepted the finding of fact by the Special Inquiry Officer that the officers had received such an invitation.

As the officers proceeded towards the kitchen, they observed a person of Chinese extraction, dressed in a blue denim uniform, scurrying through the dining room to the main entrance door. One officer (Burns) followed him to the door, stopped him, identified himself as an immigration officer, and asked the individual, later identified as petitioner Yim, to accompany him to the kitchen. As the two headed back toward the kitchen, a second employee, petitioner Lam, also dressed in kitchen garb, was met by them as he appeared to be hurrying towards the front door. He was requested by Officer Burns to go to the kitchen for a talk. Lam did so momentarily, but suddenly darted through a side door, only to encounter Officer Lamoreaux who asked him if he was off a ship and received an affirmative answer. Petitioner Lam then was sent to the locker room to change his clothes before being taken to the immigration office. When Officer Burns and petitioner Yim arrived in the locker room of the kitchen, Burns asked Yim if he had jumped a ship, to which Yim replied that he had.

During this time, two officers were questioning the employees in the kitchen, when two of the workers dropped their culinary utensils and darted out the rear door. One of the officers gave chase and halted one of the fleeing kitchen workers, later identified as petitioner Au. With the aid of another employee, who acted as interpreter, Au was questioned immediately by the officer who detained him, and admitted that he had "jumped" ship. The officer then took him to the locker room where they joined the other petitioners. All three petitioners were searched, and the officers seized seamens' documents from each petitioner which indicated that in fact they had overstayed their leave.

The three petitioners then accompanied the officers to the immigration office, where they awaited the arrival of an interpreter.[1] In the presence of the interpreter, sworn statements were taken from each of the three in which they admitted that they had come to this country as crewmen, and were illegally in the United States.[2]

*No. 23,527*

On November 7, 1967, petitioners Wong and Chan, persons of Chinese extraction, accompanied Mr. Wong's ailing brother to the Washington Hospital Center where the latter made application for medical treatment.[3] The receptionist at the hospital doubted the sick man's right to be in this country, and called the Washington immigration office. Officers Taylor and Reissig were dispatched to the hospital where, upon arrival, Officer Taylor went inside to question the sick man, and Officer Reissig remained in their government car by the front entrance.

Once inside the hospital, Officer Taylor went to a waiting room where he was to interrogate the applicant for medical assistance. However, when he identified himself to the receptionist as the immigration officer for whom the patient and two other Chinese (see note 3 *supra*) men had been waiting, and started talking to the Chinese patient at the desk, he noticed that the two petitioners rose from their chairs and left the room. Officer Taylor testified that he thought there was something odd about their departure; accordingly, when he had concluded the task of interrogating the prospective patient—a questioning that lasted some fifteen minutes, resulting in the clearance of petitioner Wong's brother—he thought he "would make quiet inquiries" and see if he could find the two men who had left.

Officer Taylor advised his colleague he was interested in these two Chinese and intended to look for them in the hospital "so that he could talk to them." He then spent approximately fifteen minutes more searching several corridors and other waiting rooms in the hope of finding the two petitioners. He stepped out of a side door of the hospital onto a

1. The record reveals that petitioners were able to speak in broken English and therefore they were able to answer the simple questions of the detaining officers. However, it is clear that for the purposes of an affidavit an interpreter was needed.

2. Before the interrogation began at the immigration office, each petitioner was, in accordance with INS policy, given the full *Miranda* warnings. Each stated that he did not wish counsel to be provided. There is no issue raised in this case as to the adequacy either of the warnings or the waiver. *Compare* United States v. Campos-Serrano, 430 F.2d 173 (7th Cir. 1970), cert. granted 401 U.S. 936, 91 S.Ct. 926, 28 L.Ed.2d 215, March 1, 1971, (*Miranda* warnings held necessary where, after

one interrogation and examination of an alien's identification papers, the immigration officers, having thereafter acquired some reason to believe that the alien was guilty of the crime of altering the papers, returned a second time to examine the papers without first giving the warnings). Similarly, since here the restaurant owner consented to the entry by INS agents we are not required to consider the disposition appropriate in a case of unconsented entry and a claim of illegality due to lack of search warrant.

3. There were apparently two other men of Chinese extraction in the party, one of whom is identified in the record as Mr. Yee Kong Ling.

sidewalk, and spotted petitioners by the hospital parking lot, about half a block away. He saw them looking back, and when they saw him they quickened their pace on into the parking lot, and broke into a jog or "sort of dog trot," glancing back at Officer Taylor as they went.

For a while they got out of his field of vision, but then he saw them inside a car parked in the lot. As Taylor approached the car, one of the men, who was in the back seat, attempted to roll up the car windows and lock the car doors. The other was in the front seat, and tried to start the car. Due to what was described by Officer Taylor as a basic unfamiliarity with the vehicle, neither petitioner was successful at his task. Taylor then attempted to question them through an open window, but soon realized that there was an insurmountable language barrier. He decided to enlist the support of Officer Reissig. In order to insure that petitioners would not leave, Officer Taylor took their car keys and asked a nearby hospital guard to watch the car for a moment. Officer Taylor located Officer Reissig, and the two returned about five to seven minutes later, bringing their car to a halt in front of the one in which the two petitioners were seated.

Several more minutes elapsed while the two officers again tried unsuccessfully to communicate with the petitioners. At this point, they sought the aid of a passing Chinese student, who agreed to act as an interpreter. The Chinese student began his interrogation under the supervision of Officer Reissig. In the meantime, Officer Taylor decided that it might be beneficial to return to the hospital to determine whether the other Chinese men in the building were related to petitioners. After a ten minute search, he found Mr. Ling, who was the owner of the car.

Mr. Ling agreed to accompany Taylor to the parking lot in order to identify the petitioners. Upon returning to the lot, Mr. Ling identified the petitioners as his friends, but refused to aid in their interrogation. However, at that time, Officer Reissig informed Officer Taylor that the Chinese student had discovered that the petitioners were in the country illegally. According to the findings of the Special Inquiry Officer, the student then left the scene of the interrogation.[4] The two officers then arrested petitioners, and transported them to the Washington headquarters. There, petitioners turned over to the investigators certain seamens' papers, and also made statements in response to interrogation. These statements were not, however, regarded by the Special Inquiry Officer as competent evidence because of what he found to be the failure of the interrogators to comply with INS regulations requiring advice of right to counsel.

4. Petitioners requested that their hearing be reopened in order that they be allowed to show that the Chinese student never existed. This request was granted by the Special Inquiry Officer. Since petitioners had been instructed by their counsel to remain silent at the hearing, the only method which they could employ to prove the nonexistence of the student was to submit an affidavit by their friend, Mr. Ling. Mr. Ling attested to the fact that he did not see the student when he came to the car to identify petitioners. He further stated that petitioners also denied the existence of the student when they related the incident to him. Mr. Ling called to the stand in order to be cross-examined by the Government.

Petitioners' counsel also hoped to disprove the existence of the student by pointing out at the hearing that the Government was unable to produce the student as a witness or even to produce the name and address of the student. However, the Board of Immigration Appeals affirmed the finding of the Special Inquiry Officer that there was, in fact, such a student. They based this finding on the testimony of Officers Taylor and Reissig, as well as the hospital policeman. Furthermore, the Board of Immigration Appeals pointed out that the record gives some indication that the student may have left the scene before the arrival of Mr. Ling, thus making Ling's observations not necessarily inconsistent with that of the officers. We are, in this state of the record, without authority to reject this finding of fact.

## II

At the hearings before the Special Inquiry Officer in both No. 23,339 and No. 23,527, petitioners were represented by counsel but, upon his advice, stood mute and presented no evidence. The claim made on their behalf there, as here, was that petitioners had been arrested without probable cause, and that the evidence offered by the Government against them was the forbidden fruit of these assertedly illegal arrests. In assessing these claims, any restraints upon the freedom of movement of petitioners must be viewed by reference to the statutory authority given immigration officers. There are two provisions of possible relevance, one being addressed to interrogation and the other to arrest, in each instance without warrant.[5]

■ We agree with the Government that the *arrest* provision must be read in light of constitutional standards, so that "reason to believe" must be considered the equivalent of probable cause. Moreover, the Government does not insist that in the matter before us each immigration officer did have probable cause to arrest when he first confronted each petitioner. It is urged that probable cause is needed only if a detention reaches the level of an arrest, and that the original encounters with petitioners were not arrests.

The Government focuses upon the *interrogation* provision of the Act as manifesting a Congressional purpose to permit immigration officers to make detentions for questioning which fall short of a full-blown arrest. It argues that such a reading of the statute is buttressed by two practical considerations: First, the number of individuals seeking to enter this country illegally is quite high, and the number who succeed in this venture has rapidly increased with each passing year; and, second, the ability to gather proof against these illegal entrants independent of a reasonable opportunity for interrogation is exceedingly difficult.

In Yam Sang Kwai v. INS, 133 U.S. App.D.C. 369, 411 F.2d 683 (1969), cert. denied, 396 U.S. 877, 90 S.Ct. 148, 24 L. Ed.2d 135 (1970), we viewed this provision (Section 287(a) (1)) as according, at the least, to immigration officers the right to seek to interrogate individuals reasonably believed to be of alien origin. The underlying rationale of that decision was that the minimal invasion of the privacy of the individual approached for questioning was justified by the special needs of immigration officials to make such interrogations. This allowance for mere questioning, which assumes the individual's cooperation, is analogous to decisions which have contemplated the same scope of authority for police officers,[6] as well as for other administrative officials.[7]

■ We are in this instance, however, confronted with a question which

---

5. Both are contained in Section 287 of the Immigration and Nationality Act, 8 U.S. C. § 1357, as follows:

    (a) Any officer or employee of the Service authorized under regulations prescribed by the Attorney General shall have power without warrant—

    (1) to interrogate any alien or person believed to be an alien as to his right to be or to remain in the United States;

    (2) to arrest any alien who in his presence or view is entering or attempting to enter the United States in violation of any law or regulation made in pursuance of law regulating the admission, exclusion, or expulsion of aliens, or to arrest any alien in the United States, if he has reason to believe that the alien so arrested is in the United States in violation of any such law or regulation and is likely to escape before a warrant can be obtained for his arrest, but the alien arrested shall be taken without unnecessary delay for examination before an officer of the Service having authority to examine aliens as to their right to enter or remain in the United States;

    *     *     *     *     *

6. Green v. United States, 104 U.S.App.D.C. 23, 259 F.2d 180 (1958), cert. denied, 359 U.S. 917, 79 S.Ct. 594, 3 L.Ed.2d 578 (1959).

7. United States v. Grandi, 424 F.2d 399 (2nd Cir. 1970) (customs officials).

the court did not have in *Yam Sang Kwai,* namely, whether the immigration officer may detain an individual, reasonably believed to be an alien, against his will for the purpose of questioning.[8] We believe the statutory interrogation authority comprehends such detentions, but, because they are far greater intrusions upon personal privacy than the nonforcible approaches, and since aliens in this country are sheltered by the Fourth Amendment in common with citizens, such a reading of the Congressional mandate must be controlled by the constitutional standards governing similar detentions made by other law enforcement officials. *See* Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). We hold that immigration officers, in accordance with the Congressional grant of authority found in Section 287(a) (1), may make forcible detentions of a temporary nature for the purposes of interrogation under circumstances creating a reasonable suspicion, not arising to the level of probable cause to arrest, that the individual so detained is illegally in this country. Utilizing the standards developed in *Terry,* such detentions are to be judged from case to case by reference to the particular facts of each. We proceed to this inquiry in the two cases immediately before us.

### III

With respect to No. 23,339, we disallow the claim that the deportation orders derive from tainted evidence. Our recent decision in *Yam Sang Kwai, supra* p. 222, insulates from illegality the steps taken by the immigration officers in proceeding upon the informant's tip to the restaurant in question and in making the initial dispositions of their forces that they did. Their approach was orderly. They were at some pains not to disrupt the regular routine of the restaurant. The management official in charge was asked for authority to enter the restaurant and to conduct the questioning in the kitchen area.[9] Such disorderliness as occurred was the product solely of the efforts of petitioners to flee the premises.

It was this response to the appearance of the immigration officers which, we think, sufficed to create a reasonable suspicion in the minds of the officers that petitioners might be illegal aliens, and thereby, under the *Terry* doctrine, warranted the temporary detention of petitioners for interrogation.[10] In the

---

8. In *Yam Sang Kwai,* the claim was that there had been an arrest without probable cause by reason of the fact that, unknown to the petitioner, immigration officers had been posted outside the building while another officer went inside to question petitioner. We held that no arrest had as yet occurred. Petitioner in that case, when approached for interrogation, cooperated voluntarily. The arrest was made only after the information elicited by questioning provided probable cause to believe that he was in the country illegally.

9. The assistant manager's testimony was that he offered the officers a table in the restaurant at which they could question employees, but he admitted that he did not forbid them from going into the kitchen. The officers testified that his grant of permission on the latter score was explicit. The special inquiry officer found this last to be the fact, and his finding was accepted by the Board. We think the finding has adequate support in the record, and we are concluded by it. 8

U.S.C. § 1105a(4). *See also* Universal Camera Corp. v. NLRB, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951).

10. In United States v. Curtis, 138 U.S.App. D.C. 360, 427 F.2d 630 (1970), we remarked *en banc* the relevance of flight at the appearance of the police to the reasonableness of a warrantless entry upon private premises for the purpose of arrest. We quoted the statement of the Supreme Court in Peters v. New York, 392 U.S. 40, 66–67, 88 S.Ct. 1889, 1904, 20 L.Ed.2d 917 (1968), that "deliberately furtive actions and flight at the approach of strangers or law officers are strong indicia of *mens rea,* and when coupled with specific knowledge on the part of the officer relating the suspect to the evidence of crime, they are proper factors to be considered in the decision to make an arrest." If flight can contribute so greatly to probable cause for arrest, it certainly has the capacity in appropriate circumstances to generate the lesser degree of reasonable suspicion requisite for an investigatory stop.

case of petitioner Yim, indeed, it is not even clear that there was a detention against his will since, once accosted in his apparent progress towards the front door, he appears to have acquiesced readily in the request by Officer Burns to accompany him to the kitchen. Once there, he immediately said that he had jumped a ship. Petitioners Lam and Au manifested their purpose to flee in a more positive manner, and would have gotten away if they had not been affirmatively intercepted. They, thus, ended up in the kitchen under circumstances more nearly resembling forcible detention, although each had given the information that he was off a ship when initially intercepted and before he reached the kitchen.

In the case of all three, there had come into being, by the time they were foregathered in the kitchen, probable cause to arrest without warrant under Section 287(a) (2); and they were so arrested and taken to the Immigration Office. No claim is made here that anything improper occurred in their further interrogation there. The argument is, rather, that their arrests occurred simultaneously with the initial approach to them by the officers in the restaurant, and before the officers acquired knowledge constituting probable cause. We think that, at most, those confrontations involved temporary detentions for questioning which were authorized by Congress and which did not, on these facts, fall afoul of the Fourth Amendment.

## IV

In No. 23,527, as noted hereinabove, the Government's case had to be made without the aid of the statements taken from petitioners Wong and Chan in the course of the investigation conducted at the Washington office following their arrest at the hospital parking lot. The Government now argues that, even if the arrests be deemed illegal, affirmance is in order because the documentary evidence introduced was sufficient to show illegal presence in the country by reason of petitioners having overstayed their limited shore leaves; and that these documents were of an official character and came into the Government's possession independently of the taking of petitioners into custody. The record, however, is in an abominably muddled state on this score, and we are unable to conclude from our examination of it that the Government's claim in this regard is well taken.[11] We look, then, to the merits of the claim of taint arising from illegal arrest.

This inquiry, of course, is the same as that we have pursued in No. 23,339. There is here no preliminary issue of the *Yam Sang Kwai* nature, since the errand upon which the two officers came to the hospital was undisputedly legitimate, *i. e.*, to check the status of the ailing Mr. Wong at the request of the hospital receiving authorities. When Officer Taylor arrived at the hospital, identified himself to the receptionist as an immigration officer, and began talking with the Chinese patient who was awaiting his arrival, his attention was struck

---

11. What the Government itself terms a major item of evidence against petitioners, namely, the crewman's landing permit (which shows the date, place, and manner of admission into the country), appears to have been located as a direct result of the detention. In the case of petitioner Wong, the Government learned, after questioning him at the immigration office, that his permit was in the hands of Mr. Ling. Therefore, the immigration officers called Mr. Ling and asked him to bring the document to the office, which he did. Petitioner Chan's permit was either seized from his person after he was arrested or

was brought to the office by Mr. Ling after Chan was questioned.

The Government points out that the remainder of the documentary evidence (Hong Kong discharge books and Hong Kong and Australian seaman's identity cards) consisted of identification papers located in the files at the immigration office. The record does not make this fact clear. However, even if this were true, we think it not unlikely that their availability may have been dependent upon determining what date and in what place petitioners entered the country.

by the fact that the two Chinese persons immediately got up from their seats in the waiting room and departed. He proceeded with his check of the sick man but resolved to explore the suspicious circumstance further as soon as he had dispatched the business immediately at hand. That took only about 15 minutes, and then he started to look for the two who had left the waiting room. He had reasonable basis to believe they were aliens and to seek to question them.

We have recounted above Officer Taylor's search through the hospital corridors, his sight of petitioners when he came out the side door of the hospital, their hasty repairment to the auto on the parking lot when they saw him, and their unsuccessful efforts to lock the car against him and to drive away. When they appeared unable to respond to his questions because of a language barrier, he reached in and took the car keys for the purpose of keeping petitioners on hand until he could find help in communication.

Petitioners press upon us that it was at this point that an arrest without probable cause occurred.[12] The point is not without difficulty, especially since several minutes elapsed before the matter of communication was brought to resolution by the fortuitous appearance of the Chinese student, who was able to talk to petitioners and who reported that they had exceeded their permissible shore leaves. The *Terry* doctrine in terms contemplates that detention for interrogation as distinct from arrest will normally be brief in duration,[13] and

the reasons why this should be so do not require explication. But the question remains one of the reasonableness of official action under the particular circumstances, and there is no fixed formula as to time, especially when we are dealing with minutes rather than hours. The delay here was occasioned by the efforts made to find a channel of communication to petitioners, not in the time consumed by their questioning once that communication became possible.

We think that the conduct of petitioners prior to and upon entering the car, including their vainly seeking to start it, was such as to found a reasonable suspicion about their status within the meaning of the gloss we have hereinabove put on Section 287(a) (1). That being so, Officer Taylor was justified in subjecting petitioners to an investigatory stop for a reasonable period of time. Because of the language barrier, that stop proved longer here than would be necessary in the usual *Terry* criminal context. But different areas of law enforcement have different problems, and legal doctrine common to all must be of sufficient flexibility to accommodate these differences. We are not persuaded that this record presents a picture of official oppression unrelieved by the quality of reasonableness central to the concept of the Fourth Amendment.

We find the deportation orders in both Nos. 23,339 and 23,527 to be valid, and we deny the relief sought in the respective petitions for review.

It is so ordered.

---

12. They stress also the circumstance that Officer Taylor asked a hospital guard, who happened to be in the vicinity, to keep an eye on the car while he went to find his partner. The testimony of record indicates that the making of this request was not known to petitioners and that they were not aware of the presence of the guard during the five minutes or so that Taylor was away. The guard testified that he was not sure what he would have done if petitioners had tried to leave the car, since Taylor had said nothing about this contingency, although he thought he would probably have endeavored to stop them. The issue, in any event, never arose, since petitioners continued to sit in the car.

13. The word "briefly" appears in both Justice Harlan's and Justice White's concurrences in *Terry*. 392 U.S. at 33, 34, 88 S.Ct. 1868.