**BONG YOUN CHOY and Tung Suck Choy, Appellants,**

v.

**Bruce G. BARBER, District Director, Department of Justice, Immigration and Naturalization Service, Appellee.**

**No. 16159.**

United States Court of Appeals Ninth Circuit.

June 7, 1960.

Walker Lowry, Brent M. Abel, Glenn Richard Murray, McCutchen, Doyle, Brown & Enersen, San Francisco, Cal., for appellants.

Robert H. Schnacke, U. S. Atty., Charles Elmer Collett, Asst. U. S. Atty., San Francisco, Cal., for appellee.

Before STEPHENS, BAZELON and HAMLIN, Circuit Judges.

STEPHENS, Circuit Judge.

Bong Youn Choy and his wife are resident aliens who are suffering under orders of deportation issued by respondent. They appeal from a ruling of the District Court rendered pursuant to 5 U.S.C.A. § 1009 sustaining the administrative action. See Shaughnessy v. Pedreiro, 1955, 349 U.S. 48, 75 S.Ct. 591, 99 L.Ed. 868.[1]

The Choys were born in Korea and came to the United States from Japan as students, he in 1938, she in 1941. They married in California in 1942, and now have three children, all American citizens. During World War II, Mr. Choy continued his studies, earning a master's degree in political science from the University of California. He also translated Japanese documents for the government and taught the language to members of the armed forces. The Immigration Service adjusted Mr. Choy's status from time to time, extending his visa.

In 1946, Mr. Choy was employed by the War Department for work with the American Military Government in Korea. His wife and children subsequently joined him there. The family was brought back to the United States by the government in 1948; Mr. and Mrs. Choy entering under visitors' visas. Soon after their return to this country, the Choys moved to Seattle, Washington, the primary scene of their ensuing troubles.

In May, 1950, the Immigration Service issued deportation warrants charging the Choys with overstaying their visas. Mr. Choy was brought before a hearing officer in Seattle in July, 1951, his wife apparently forgotten by the authorities for the time being. The charges then lodged against Mr. Choy were that in 1948 he had entered the United States as an immigrant without an immigrant's visa in violation of 8 U.S.C. § 213(a) (1946 ed.), superseded by 8 U.S.C.A. § 1181(a), and that he had become a member of the Communist Party of the United States subsequent to his entry. See 8 U.S.C. § 137-3(a) (1946 ed. Supp. IV), superseded by 8 U.S.C.A. § 1251(a) (6) (C). At his hearing Choy testified that he had joined the Communist Party of the United States late in 1948 and that for a period of about five months he had attended monthly Party meetings comprised of himself and three Korean friends. He admitted that at one of these meetings he had filled out an application blank for membership in the Party. The purpose of the meetings, said Choy, was to discuss Communism and its various ramifications. Furthermore, Choy conceded that he had paid Party dues through one of his Korean friends in amounts ranging from fifty cents to a dollar each month.

A statement taken from Choy on April 17, 1951, describing his Communist activities in similar terms was also admitted into evidence at the hearing.[2]

---

1. The deportation proceedings against Mr. Choy were commenced prior to the enactment of the Immigration and Nationality Act of 1952. Consequently, pursuant to § 405 of that Act, see 8 U.S.C.A. § 1101 note, the law as it was prior to 1952 is to be applied in his case. Nonetheless, the means of review available must be determined in accord with present law, see Shung v. Brownell, 1955, 97 U.S.App.D.C. 25, 227 F.2d 40, affirmed, 1956, 352 U.S. 180, 77 S.Ct. 252, 1 L.Ed. 2d 225; Muscardin v. Brownell, 1955, 97 U.S.App.D.C. 16, 227 F.2d 31.

2. The significant portion of this statement is as follows:

"'Q. Are you now, or have you ever been a member of the Communist Party? A. I have been a member of the Communist Party, but not now.

"'Q. When and where did you become a member of the Communist Party? A. I think it was November or December of 1948 at Seattle.

"'Q. When did your Communist Party membership terminate? A. I paid about three or four months dues, and that is all I can remember, and since that time I

Choy further testified that when he arrived in the United States in 1948, he intended a temporary visit of sufficient duration to enable him to complete his studies for a doctorate degree. He also planned to arrange to remain in this country long enough to afford his children an American high school education.

As a result of this hearing Mr. Choy was ordered deported on the charges lodged against him. However, the deportation order was subsequently withdrawn, and the hearing was reopened in San Francisco in 1953.

This time Choy testified that he had never joined the Communist Party of the United States, that during the months of his alleged Communist activity he and his three Korean friends had held monthly meetings simply to discuss the political situation in their native land, and that they discussed Communism in its relation to Korea's divided condition. Choy did not think that these gatherings were Communist Party meetings, and although he did sign a card of some sort, he could not remember what it was. He admitted paying fifty cents to a dollar each month to one of his friends. However, he claimed that the payments were not designed on his part as Communist Party membership dues, but were given rather for friendship's sake.

Mr. Choy also testified to events which led to the statement taken from him in April, 1951, regarding his Communist activities. See note 2, supra. According to Choy, whose testimony was unchallenged by the government, he was asked to come to Immigration offices on the evening of April 16, 1951, soon after supper. He waited in a room there for about fifteen minutes before the advent of a Mr. Garvey. Garvey greeted Choy harshly.[3] He had Choy draw a pencil line on a piece of paper and write above the line "South Korean Police and American M.P." Below the line Choy was asked to write "I have a wife and three American-born children." Following this exercise, Garvey asked Choy if he knew what would happen to him if he were deported. Choy replied that he would be persecuted. Garvey agreed and again upbraided Choy.[4] Garvey then left the room returning with a Mr. Stevens and a stenographer. Stevens proceeded to interview Choy, who continually denied that he was involved with the Communists. Stevens confronted Choy with a statement by Mr. Namkung, one of the Koreans with whom Choy met at several monthly meetings. The statement disclosed that these monthly meetings were Communist Party gatherings. Garvey emphasized the significance of this statement by calling Choy a liar. Namkung was brought in to identify Choy, who still denied Communist membership. The interview ended at midnight and Garvey took Choy home. On the way Garvey noted that Namkung was cooperative whereas Choy was not. Choy agreed to talk further and returned with Garvey to Immigration offices. A second interview took place, terminating at 3:00 A.M. Choy still denied Party

---

have not paid dues or attended Communist Party meetings. (p. 1.)

* * * * *

" 'Q. Do I understand that Harold Sunoo, Johsel Nam Kung, Kyung Soon Lee, were also members of the Communist Party? A. I think so. (p. 3.)

* * * * *

" 'Q. Is there anything else that you wish to say at this time? A. I think as far as I am concerned, this last statement which I am going to make, is very important to me. I came this morning voluntarily, to testify myself, since we had interview last night. I made really foolish and silly mistake in my entire life, joining the Communist Party, by the influence of my friend whom I believed so much as Minister of church * * *' (p. 18.)" Transcript of Record, p. 30.

3. Garvey allegedly said, "Shut your mouth, God damn you."

4. Garvey allegedly said:
   "You God Damn Communist. My cousin or nephew in the Marine Corps in Korea, and they're fighting against Communism. You Koreans come over to the United States and joining Communist."
   Choy testified:
   "He gave me all kind of insults."
   Administrative Transcript, p. 131

affiliation. Upon parting, Garvey told Choy that if he didn't agree with Namkung's statement, he would either be deported within three weeks or charged with perjury.[5] Choy was upset by these happenings and couldn't sleep. He contacted Namkung, who acknowledged accusing Choy of Party membership. The next day at 8:30 in the morning, Choy made the statement which was admitted in evidence against him.[6]

Charges against Mrs. Choy were also lodged at the San Francisco hearing. She was accused of being an excludable alien at the time of entry in that she had entered in 1948, as an immigrant without an immigrant's visa. See 8 U.S.C.A. § 1251(a) (1); 8 U.S.C. § 213(a) (1946 ed.). She testified that she did not intend to stay in this country permanently at the time she entered, but intended only to attempt to arrange to remain if such an arrangement were possible.

Following this hearing, the Choys were both ordered deported on the lodged charges. They challenge all the grounds upon which their deportation is predicated.

### The Illegal Entry

■ To have entered the United States in violation of 8 U.S.C. § 213(a) (1946 ed.)—"No immigrant shall be admitted to the United States unless he (1) has an unexpired immigration visa. * * * "—the entrant must first have been an immigrant. And pursuant to 8 U.S.C. § 203 (1946 ed.),* "an alien visiting the United States temporarily as a tourist or temporarily for business or pleasure" was not an immigrant. Appellants contend that when they came to the United States from Korea in 1948, they intended to stay only temporarily, that they planned to remain only if they could make such an arrangement within the framework of the immigration laws, and that therefore they were not immigrants within the meaning of the statute.

The record shows that Mr. Choy wished to do three things on his return to the United States: To continue his graduate education, to support his family, by working, if necessary and to provide his three children, if possible, with an American high school education. None of these purposes are inconsistent with the representations made by Mr. Choy when he obtained a visitor's visa from the American consul in Seoul, Korea. The consul was apparently well aware that Choy would remain in the United States if it was legally possible for him to do so. None of Mr. Choy's actions indicate fraud or misrepresentation.

In Brownell v. Stjepan Bozo Carija, 1957, 102 U.S.App.D.C. 379, 254 F.2d 78, 80, the court said:

"It is quite true that, if an alien enters the United States on a temporary permission but with a determination to stay here if possible— meaning by any means possible,—so that his representations to the authorities are false or fraudulent or misrepresentative, he has not lawfully entered this country. The cases so hold, and we agree with that doctrine. The permit upon which such an alien enters, reciting that he is visiting the United States temporarily, or is a seaman entering temporarily solely in the pursuit of his calling as a seaman, is an invalid document in that it was issued upon false information. If the aliens before us had not had a bona fide intent to travel through the United States, as their visas permitted, the case would fall under that doctrine. But we do not have such a case here.

---

**5.** The words used by Garvey allegedly were:
"Well, I tell you, frankly, what is going to happen to you. You will be deported within the next three weeks, or you will be charged with perjury, if your statement isn't in agreement with Mr. Nam Kung."

**6.** At the San Francisco hearing, the government introduced another statement made by Choy to F.B.I. agents in October, 1952. At that time Choy admitted joining the Communist Party, attending Party meetings and paying Party dues.

* Now 8 U.S.C.A. § 1101(a) (15) (B).

These people, so far as this record shows, were in transit in good faith. They were actually en route through this country. In the words of the complaint, admitted by the Attorney General, they possessed 'also' the intention about remaining here. That they entertained 'a desire or purpose or intent' to take advantage of an opportunity afforded them by the laws of this country to remain here, if such an opportunity should offer itself, does not seem to us to smack of the unlawful or to negative their other basic intent to proceed through the United States as their transit visas required. The problem is the unlawfulness of the entries." [Footnotes omitted]

See also United States ex rel. Antonini v. Curran, 2 Cir., 1926, 15 F.2d 266.

We think this case falls within the shadow of Carija. When Mr. Choy came to the United States from Korea, he intended to stay temporarily with a determination to remain here only if lawfully possible. The same of course can be said for Mrs. Choy. Consequently, the Choys did not come to our shores as immigrants in 1948, and the charges that they were excludable at the time of entry must fail.[7]

### Communist Party Membership

■ In reply to this charge Mr. Choy presents a number of arguments. We find it necessary to address ourselves, however, only to his contention that the admissions contained in the statement taken from him on April 17, 1951, were obtained through coercion by agents of the Immigration Service in violation of the due process clause of the Fifth Amendment. We have above described the factual allegations of coercion upon which the appellant relies, and conclude that the conduct of the Immigration officers on the night of April 16, rendered the statement made by Mr. Choy on the following day inadmissible at his hearing approximately six weeks later. Deportation proceedings must conform "to traditional standards of fairness encompassed in due process of law." Shaughnessy v. United States ex rel. Mezei, 1953, 345 U.S. 206, 212, 73 S.Ct. 625, 629, 97 L.Ed. 956. See also Kwong Hai Chew v. Colding, 1953, 344 U.S. 590, 596, 601, 73 S.Ct. 472, 97 L.Ed. 576; United States ex rel. Bilokumsky v. Tod, 1923, 263 U.S. 149, 157, 44 S.Ct. 54, 68 L.Ed. 221. Expulsion cannot turn upon utterances cudgeled from the alien by governmental authorities; statements made by the alien and used to achieve his deportation must be voluntarily given. See Quattrone v. Nicolls, 1 Cir., 210 F.2d 513, 517 certiorari denied, 1954, 347 U.S. 976, 74 S.Ct. 786, 98 L.Ed. 1116; United States ex rel. Kataliakos v. Jordan, 7 Cir., 1950, 179 F.2d 422, 425; Goncalves-Rosa v. Shaughnessy, D.C.S.D. N.Y.1957, 151 F.Supp. 906, 909.[8]

■ Mr. Choy's testimony as to his encounter with the Immigration officers on the night of April 16, is unchallenged. Assuredly, the treatment accorded Choy, a highly educated man, does not approach the degree of intimidation to which Fikes, in Fikes v. State of Alabama,

7. Moreover, it would seem to strain the conscience even to attempt to justify the government's actions in employing and transporting Choy to Korea, to there use his talents in its military administration and when no longer needed, to return him to this country and ascribe to him an immigration status of far less advantage to him than that which he had previously enjoyed.

8. In United States ex rel. Bilokumsky v. Tod, supra, the Supreme Court held that a statement taken from the alien there involved was voluntary and would have been admissible evidence in a criminal case. In dictum, however, the court noted that the involuntary confession rule could have no application in deportation proceedings, which were civil in nature. 263 U.S. at page 157, 44 S.Ct. at page 57. To render a deportation hearing unfair, said the Court, an element essential to due process of law would have to be absent. The development of the coerced confession rule as an adjunct to procedural due process of law postdated the Bilokumsky decision and renders the dictum above referred to inapposite.

1957, 352 U.S. 191, 77 S.Ct. 281, 1 L.Ed. 2d 246 or Payne in Payne v. State of Arkansas, 1958, 356 U.S. 560, 78 S.Ct. 844, 2 L.Ed.2d 975, both persons of rather low mentality, were subjected.[9] Even so, after approximately seven hours of interrogation continuing into the wee hours of the morning, Choy was told by Garvey that if he did not offer a statement in conformity with Namkung's accusations against him, he would be prosecuted for perjury or deported within three weeks. This heavy-handed threat was followed by sleepless hours for Choy, and finally, weary and distressed, he sought to appease his official accusers by making the statement containing the admissions. See note 2, supra. We think the undisputed evidence demonstrates that the admissions obtained from Choy on the morning of April 17, were the product of the abusive interrogation which was followed by the threat of imminent deportation or prosecution for perjury. A statement obtained by the government by inducing fear through official threats of prosecution is not voluntarily given. See Cannan v. United States, 5 Cir., 1927, 19 F.2d 823, 824; Symons v. United States, 9 Cir., 1949, 178 F.2d 615, 619–620; Martin v. United States, 4 Cir., 1948, 166 F.2d 76, 79. It can no more be used as a basis for deportation than for conviction of a crime. In the instant case, the record leaves no room for doubt that the improper conduct of the Immigration agents induced the admissions made by Choy on the following day. See Lyons v. State of Oklahoma, 1944, 322 U.S. 596, 603, 64 S.Ct. 1208, 88 L.Ed. 1481; Leyra v. Denno, 1954, 347 U.S. 556, 561, 74 S.Ct. 716, 98 L.Ed. 948. It requires no stretch of the imagination to appreciate the mental terror the government officials' treatment caused Choy. Consequently, the inclusion into evidence of Choy's April 17 statement transgressed due process of law.

This determination does not yet conclude the issue of deportability, for in addition to the involuntary statement of April 17, 1951, Choy also admitted, both at the Seattle hearing in July, 1951, and in a statement given to the F.B.I. in October, 1952, that he was a member of the Communist Party. On the other hand, both at the San Francisco hearing in 1953, and in a statement given to Immigration officers in October, 1950, he denied that he had anything to do with the Party. The special inquiry officer, as appears from his written decision following the 1953 hearing, placed great weight on the April 17, 1951 statement. We cannot say whether or not, without it, the special inquiry officer would have concluded as he did. Consequently, we find ourselves confronted by a situation similar to that faced by the Supreme Court in Payne v. State of Arkansas, 1958, 356 U.S. 560, 568, 78 S.Ct. 844, 2 L.Ed.2d 975, where it was said that when the weight and credibility given a coerced confession cannot be determined, a conviction upon a record containing such a statement must be overturned. We feel governed by the Payne ruling, and therefore conclude that deportation upon the charge of membership in the Communist Party cannot stand.

Since the order of deportation must be set aside because the coerced statement was received in evidence and was specifically taken into consideration by the special inquiry officer, we need not and should not discuss the tenuous issue as to whether Mr. Choy's actions can be held to bring him within the sweep of meaningful membership in the Communist Party of the United States. See Rowoldt v. Perfetto, 1957, 355 U.S. 115, 78 S.Ct. 180, 2 L.Ed.2d 140; Galvan v. Press, 1954, 347 U.S. 522, 74 S.Ct. 737, 98 L.Ed. 911.

Reversed.

9. We assume that where statements are alleged to have been obtained by coercion in violation of the due process clause of the Fifth Amendment, the same test utilized in cases where the due process clause of the Fourteenth Amendment is invoked would apply. See Note, 66 Yale L.J. 270, 278 n. 32 (1956); Note, 5 Stan. L.Rev. 459, 460 n. 9 (1953).