Maria Irma NAVIA–DURAN, Petitioner,

v.

IMMIGRATION AND NATURALIZA-
TION SERVICE, Respondent.

No. 77–1160.

United States Court of Appeals,
First Circuit.

Heard Sept. 9, 1977.

Decided Dec. 30, 1977.

Harvey Kaplan, New York City, with whom Lawrence D. Bastone, Alberto O. Jimenez, Adrienne Collier, and Stephen H.

* Of the Fifth Circuit, sitting by designation.

Oleskey, and Hale & Dorr, Boston, Mass., were on brief, for petitioner.

Lauren S. Kahn, Dept. of Justice, Washington, D.C., with whom Philip Wilens, Chief, Government Regulations and Labor Section, Crim.Div., and James P. Morris, Dept. of Justice, Washington, D.C., were on brief, for respondent.

Before COFFIN, Chief Judge, TUTTLE,* Circuit Judge, WOLLENBERG,** District Judge.

TUTTLE, Circuit Judge.

The appellant, Maria Irma Navia-Duran, is a 53-year-old native of Chile who allegedly entered this country on a temporary visitor's visa in 1974 and remained beyond its expiration. On the night of January 13–14, 1976, Ms. Navia-Duran was questioned by agents of the Immigration and Naturalization Service (INS) at her home and at INS headquarters in Boston concerning her alleged alien status. Following approximately four hours of interrogation, from 10 p.m. until 2 a.m., Ms. Navia-Duran signed a statement admitting her illegal presence in this country. On the sole basis of that statement, an immigration judge found Ms. Navia-Duran deportable under section 241(a)(2) of the Immigration and Nationality Act, 8 U.S.C. § 1251(a)(2) (1970), because she had remained in the United States longer than permitted. The judge granted her one month for voluntary departure with an alternate order of deportation to Chile. The Board of Immigration Appeals (BIA) affirmed the order on March 9, 1977.

Ms. Navia-Duran seeks review in this court under 8 U.S.C. § 1105a, asserting, among other things, that her statement should not have been used against her because it was the product of psychological coercion, intimidation, and misrepresentation of facts on the part of her INS interrogators. We find from the totality of circumstances surrounding Ms. Navia-Duran's apprehension and interrogation that

** Of the Northern District of California, sitting by designation.

the order of deportation was rendered in violation of due process. Accordingly, we vacate the order and remand for a new hearing in which her rights are properly protected.

In affidavits accompanying prehearing motions, the appellant and three other affiants described the events leading up to the deportation hearing. The INS did not submit any counter-affidavits or dispute the accuracy of Ms. Navia-Duran's account of the facts, except for one fact which will be discussed below. From these affidavits it appears that early in the evening of January 13, 1974, two of the appellant's housemates were detained by INS agents at a Boston restaurant, questioned about their alien status, and taken to their residence to get their identification papers. Ms. Navia-Duran's roommate, who was at home when the group arrived, was also questioned. The agents searched the apartment, including the appellant's bedroom, without warrant or consent, and allegedly seized some papers. Two of the three aliens were taken to INS offices, served with orders to show cause why they should not be deported, and held overnight in jail.

Later that same night, at approximately 10 p.m., Ms. Navia-Duran was approached from behind as she was about to enter her apartment. Without addressing her by name, a man identified himself as an INS agent and asked if she spoke English. Ms. Navia-Duran responded that she spoke Spanish. The agent requested identification, which she said was inside the apartment. Extremely frightened by this late-night approach and convinced that she had no choice but to cooperate, Ms. Navia-Duran opened her door and was followed in by this agent and by a second man who identified himself as Mr. Constance. Ms. Navia-Duran produced numerous documents, all of which were confiscated. The agents questioned her in Spanish for approximately one hour concerning her presence in the United States. During this period, Agent Constance told Ms. Navia-Duran that she must return to her native Chile immediately.

At approximately 11:30 p.m., the agents took Ms. Navia-Duran to the INS office and continued questioning her until 2 a.m. Constance showed her a calendar and told her that she must leave the country in two weeks. When the appellant protested that she needed more time, the agent reiterated that she must leave in two weeks; he characterized his offer as a fair deal for her. Throughout the early morning session, Constance insisted that she had no choice but to accept the two-week departure deadline. Fearing that she would not be permitted to go home until she cooperated, Ms. Navia-Duran signed a statement which admitted that she had entered this country on a three-month visitor's visa in 1974 and had never received an extension of time.

Her statement was made in Spanish and transcribed by Agent Constance in English upon an INS form which the appellant signed. This form contained, in addition to Ms. Navia-Duran's admission, a printed recitation in English that the appellant had been advised that her statement must be freely and voluntarily given, that it could be used against her in a subsequent proceeding, and that she had the right to remain silent, to seek advice of a lawyer before answering questions, to terminate the interrogation at any time, and to have a lawyer appointed for her if she could not afford one. The form also stated that her statement was taken under oath.

Ms. Navia-Duran steadfastly denies that the printed portion of the form was read or explained to her. She claims that she was not advised of any rights, including the right to a deportation hearing. On the contrary, she was led to believe that her fate rested solely in the hands of Agent Constance, who repeatedly represented to her that the best deal available to her was his offer to delay her departure by two weeks.

Before leaving the INS office, the appellant was told to return the next day to complete her travel arrangements. Ms. Navia-Duran sought out an attorney, who explained her right to a deportation hearing. He accompanied her back to INS headquar-

ters at 2 p.m. that same day and requested a hearing for his client, over the opposition of Agent Constance, who allegedly yelled at the attorney, called him an idiot, and said that he would not give that attorney's clients any more breaks. According to the attorney's affidavit, the agent stated that he had been "good to [Ms. Navia-Duran] because of her age," but, because she was now insisting on a hearing, the Service would recommend against voluntary departure. Ms. Navia-Duran was then served with an order to appear for a hearing on January 21 and show cause why she should not be deported.

Prior to her deportation hearing, the appellant moved to suppress the statement made during her interrogation and to subpoena certain witnesses to testify in her behalf.[1] The motion to suppress asserted various Fourth Amendment violations, including Ms. Navia-Duran's arrest without warrant or probable cause and the earlier search of her bedroom, and claimed that these illegalities had tainted her statement. The subpoenas would have required the presence of the owner of the restaurant where the appellant's housemates were apprehended as well as Agent Constance and other INS officials. In support of these motions, the appellant submitted her own affidavit and affidavits from two of her housemates and her attorney. None of these prehearing filings specifically alleged that Ms. Navia-Duran's statement had been coerced, although her affidavit makes clear her contention that the statement was extracted in an atmosphere of ignorance, stress, and misleading information.

At the January 21 hearing before an immigration judge,[2] Ms. Navia-Duran remained silent upon advice of counsel, calling upon the Government to prove its case. She did give her name and acknowledged that she understood the charge against her. The immigration judge denied the prehearing motions because he considered the manner of her arrest immaterial to the question of her deportability.

When the statement was introduced into evidence by the INS attorney, the appellant's attorney objected on the same Fourth Amendment grounds specified in the motion to suppress. Additionally, the attorney asserted that the form had not been properly executed because the space for a witness' signature was blank and because Ms. Navia-Duran had not been advised of her rights before making the statement. His objections were overruled, and the statement was received in evidence[3] without any testimony concerning the circumstances of its execution. Ms. Navia-Duran refused to state whether the signature and initials on the form were hers. No one from the INS appeared to authenticate the statement as the one made by Ms. Navia-Duran, nor did any INS officer testify that the statement was made under oath, although the form recites that fact. Apparently neither Agent Constance nor any other INS official attended the hearing. No other evidence was introduced on the issue of deportability, although Ms. Navia-Duran did answer questions on the issue of voluntary departure.[4] She was granted one month in which to depart voluntarily in lieu of deportation.

In his oral opinion, the immigration judge held that, because the appellant did not deny the truth of any facts in her statement, that statement constituted clear, unequivocal, and convincing evidence of deportability, as required by 8 C.F.R. § 242.-14(a). He stated that there was no evidence that the statement was involuntary even though she claimed that she was not informed of her rights, but he did not dis-

---

1. An immigration judge is authorized to subpoena witnesses at the request of an alien who complies with the procedural requirements. 8 C.F.R. § 287.4(a)(2).

2. Ms. Navia-Duran was provided with an interpreter during the hearing.

3. The use of prior statements as evidence of deportability is expressly authorized by 8 C.F.R. § 242.14(c).

4. An application for voluntary departure may be made during a deportation hearing and does not "constitute a concession of alienage or deportability." 8 C.F.R. § 242.17(d).

pute the credibility of her affidavit. In fact, he relied upon information contained in it to support his conclusion that the statement used against her was hers.

On appeal to the Board of Immigration Appeals (BIA), Ms. Navia-Duran expressly challenged the voluntariness of her statement and its use in the absence of warnings about her rights. The BIA upheld the order of the immigration judge, finding no evidence to substantiate her claim that the statement was made involuntarily or without being warned of her rights. The BIA also ruled that the motions to suppress and to subpoena witnesses were properly denied because "evidence concerning the particulars of respondent's arrest . . . would not be material to the issue of deportability."

As the matter stands before us, we have an allegedly deportable alien claiming that the sole evidence supporting her deportation order was extracted from her under circumstances which undermined its reliability and deprived her of due process. We have examined the totality of facts surrounding Ms. Navia-Duran's treatment by the INS and have concluded that, while no one factor is dispositive, sufficient irregularities have occurred so as to require sending this matter back to the INS for a new hearing without the use of the appellant's statement.

Even though Ms. Navia-Duran did not specifically raise the issue of coercion before the immigration judge, we do not believe that she is precluded from pressing that argument before this Court. The BIA, vested with the authority to render a final agency decision, 8 C.F.R. § 243.1, did consider that precise issue and decided it adversely to appellant. In *Bridges v. Wixon*, 326 U.S. 135, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945), the Supreme Court stated that even though a particular objection was made for the first time before the Board, that objection could be properly considered on appeal to the courts. Furthermore, the immigration judge had before him sufficient allegations and affidavits to focus his attention upon the possibility of an involuntary confession. His reference to voluntariness in his opinion suggests that he considered the question. Nor should the appellant be penalized for her failure to testify at her hearing on this issue. She had requested a subpoena to compel Agent Constance's attendance, but it was denied. Once the judge ruled that the circumstances surrounding her arrest were immaterial, it was not unreasonable for Ms. Navia-Duran to believe that her testimony on that issue would not be accepted. Moreover, without the agent's testimony, she could add nothing to what was already contained in her affidavit.

We also note that the INS made no effort to refute the factual allegations contained in Ms. Navia-Duran's affidavits. The immigration judge did not expressly pass upon the credibility of her account, but, by relying on portions of it to link the appellant to the statement used against her, he indicated his acceptance of its veracity at the same time that he discounted its relevance. By the operation of 8 C.F.R. § 242.15, the appellant's affidavits, which were marked as exhibits at the hearing, became a part of the record. Because they are virtually unchallenged, we have accepted their assertions as true. It seems clear from these documents that the entire interrogation of Ms. Navia-Duran was conducted in Spanish. Yet the only presentation made to her by the INS of the rights she was entitled to under the agency's own regulations was in printed English. Ms. Navia-Duran denied that the INS agent advised her of all or any of the rights printed on the form she signed and initialed.

In its brief, the INS contends that Ms. Navia-Duran was advised of her rights prior to making her statement, but the sole support for the Government's position is the recitation of that fact on the printed form. The INS offered no testimony at the hearing to support its position, although it could easily have put an agent on the stand to describe the procedures accompanying the taking of the statement. In fact, the INS position on appeal is that no warnings were required, either by *Miranda v. Arizona*, 384

U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), or by INS regulations. The agency explains the presence of the printed *Miranda* warnings on the form as excess verbiage which is only applicable when criminal charges are brought against an alien. Since Ms. Navia-Duran was not charged with a criminal offense, the INS argues, the warnings were superfluous. It can be inferred from this argument that the appellant's interrogators did not believe that any warnings were required and that, therefore, as claimed by the appellant, they did not give any.

■ We agree with the INS that *Miranda* warnings are not applicable in a deportation setting. This Court has held that the absence of *Miranda* warnings does not render an otherwise voluntary statement inadmissible. *Nai Cheng Chen v. Immigration and Naturalization Service*, 537 F.2d 566 (1st Cir. 1976). *See also Chavez-Raya v. Immigration and Naturalization Service*, 519 F.2d 397 (7th Cir. 1975); *Lavoie v. Immigration and Naturalization Service*, 418 F.2d 732 (9th Cir. 1970). But those cases do not suggest that the use of an involuntary statement is permissible in a deportation hearing. Nor do they preclude consideration of the absence of warnings as a relevant factor in assessing the question of voluntariness. *See Makarewicz v. Scafati*, 438 F.2d 474 (1st Cir. 1971) (lack of warnings is relevant to voluntariness determination in criminal setting). The cited cases also fail to deal with another issue presented in this case. For the appellant here argues that the use of her statement was a violation of her due process rights as guaranteed by the Fifth Amendment both because the statement was involuntary and because an INS regulation requires that a person who is arrested without a warrant must be advised of certain rights quite apart from the *Miranda* rule. We have found these arguments persuasive. We did not consider this precise question in *Nai Cheng Chen* because there the interrogation occurred at home without an arrest and there was no suggestion of involuntariness. Moreover none of the above cited cases considered the relevancy of INS regulations

requiring warnings; all three cases focused exclusively on the question of whether the constitutional requirements of *Miranda v. Arizona* applied to deportation proceedings.

■ That an alien who is charged with deportability is entitled to due process is beyond dispute. *Shaughnessy v. Mezei*, 345 U.S. 206, 212, 73 S.Ct. 625, 97 L.Ed. 956 (1953); *Wong Yang Sung v. McGrath*, 339 U.S. 33, 49–50, 70 S.Ct. 445, 94 L.Ed. 616 (1950); *The Japanese Immigrant Case*, 189 U.S. 86, 100–01, 23 S.Ct. 611, 47 L.Ed. 721 (1903). To assure fair treatment of aliens, the Immigration and Nationality Act sets forth procedures to be followed at a deportation hearing. 8 U.S.C. § 1252 (1970). These statutory requirements have been supplemented by regulations which delineate more particularly an alien's rights from the initiation of proceedings to the entry of a deportation order. 8 C.F.R. § 242. As the Supreme Court stated in *Bridges v. Wixon*:

> Here the liberty of an individual is at stake. . . . We are dealing here with procedural requirements prescribed for the protection of the alien. Though deportation is not technically a criminal proceeding, it visits a great hardship on the individual and deprives him of the right to stay and live and work in this land of freedom. That deportation is a penalty—at times a most serious one— cannot be doubted. Meticulous care must be exercised lest the procedure by which he is deprived of that liberty not meet the essential standards of fairness.

326 U.S. 135, 154, 65 S.Ct. 1443, 1452, 89 L.Ed. 2103 (1945). In that case, the Court vacated a deportation order because of noncompliance with a regulation requiring that statements used as evidence must be in writing and under oath, and that a signature must be requested. Another regulation required warning a person under investigation that his statement might be used against him in a subsequent proceeding.

Failure to comply with an INS regulation was also the basis for reversal of a deportation order in *Accardi v. Shaughnessy*, 347

U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954). The Court reiterated its belief that compliance with the regulations was an essential safeguard of an alien's right to due process. *See also MacLeod v. Immigration and Naturalization Service*, 327 F.2d 453 (9th Cir. 1964). *But see Trias-Hernandez v. Immigration and Naturalization Service*,[5] 528 F.2d 366 (9th Cir. 1975). Moreover, the accepted rationale for not requiring *Miranda* warnings in deportation cases, that the Constitution does not offer the same level of protection to persons subject to civil proceedings as it does to criminal defendants, cannot excuse the failure of federal agencies to abide by their own regulations. The rule that such agency failure violated due process evolved in the context of civil not criminal proceedings. *See Vitarelli v. Seaton*, 359 U.S. 535, 79 S.Ct. 968, 3 L.Ed.2d 1012 (1959) and *Smith v. Resor*, 406 F.2d 141 (2d Cir. 1969). In *United States v. Leahey*, 434 F.2d 7 (1st Cir. 1970), we explained that due process interests of uniformity and reliance require that evidence obtained in violation of public directives are unacceptable at any adjudicative hearing.

*Leahey* involved a suppression motion after arraignment. However, its holding that, while IRS investigators need not give full *Miranda* warnings to persons being interrogated, they must conform to their own procedures is broad enough to cover the facts of the present case.

■ The case at bar presents the same issue which was dealt with in *Bridges* and *Accardi*, for here an INS regulation, 8 C.F.R. § 287.3, requires that a person arrested without a warrant must be advised of his right to legal representation at a deportation hearing and of the possible use of his statement in a subsequent proceeding.[6] The apprehension and detention of Ms. Navia-Duran certainly amounted to an arrest without a warrant,[7] even if the INS agents did not apply that label. *See Yam Sang Kwai v. Immigration and Naturalization Service*, 133 U.S.App.D.C. 369, 411 F.2d 683 (1969). Furthermore, 8 C.F.R. § 287.3 clearly applies to warrantless arrests which precede the issuance of an order to show cause, as here.[8]

**5.** Although the *Trias-Hernandez* case dealt specifically with 8 C.F.R. § 287.3, *see* note 6 *infra*, the same regulation allegedly violated in the present case, it did so in a distinguishable context. The question decided by the court in *Trias-Hernandez* was whether the regulation required the INS to give *Miranda* warnings or "comparable admonitions." We are solely concerned with whether the regulation requires even minimal warnings since none were offered to plaintiff. Also it was not even clear to the court in *Trias-Hernandez* that the petitioner was in custody. In the present case the conditions of plaintiff's interrogation aggravated the need for the warnings mandated by the regulation.

**6.** The relevant portion of 8 C.F.R. § 287.3 states:

An alien arrested without a warrant of arrest shall be advised of the reason for his arrest and his right to be represented by council [sic] of his own choice, at no expense to the Government. He shall also be advised that any statement he makes may be used against him in a subsequent proceeding . . . .

**7.** We do not address the question whether the appellant's arrest was properly supported by probable cause or reasonable suspicion, nor do we decide whether the warrantless arrest satisfied the statutory requirements as set forth in 8

U.S.C. § 1357(a)(2) (1970), which authorizes a warrantless arrest by an INS agent when he has reason to believe that the alien arrested is in the United States in violation of the law and is likely to escape before a warrant can be obtained. For purposes of our decision, we assume that the arrest met this test, but find that the agents failed to comply with the regulation governing an otherwise proper warrantless arrest. Thus, we do not decide what effect a Fourth Amendment violation would have upon the use of a statement obtained as the fruit of an illegal arrest or whether the exclusionary rule would bar the use of a voluntary statement so obtained.

**8.** The regulation provides:

Unless voluntary departure has been granted pursuant to § 242.5 of this chapter [which authorizes certain INS officials to grant voluntary departure when an alien *has applied for it*], the alien's case shall be presented promptly and in any event within 24 hours, to the district director, deputy district director, or acting district director for a determination as to whether there is prima facie evidence that the arrested alien is in the United States in violation of law and for issuance of an order to show cause and warrant of arrest prescribed in Part 242 of this chapter.

■ We reject the Government's argument that this regulation, like *Miranda*, applies only when criminal charges have been brought against an alien. Nothing in the language of the regulation supports that theory. Indeed, the regulation clearly addresses the situation where the warrantless arrest is to be followed by a deportation hearing. *See* n. 8, *supra*. Furthermore, if this regulation were meant to guarantee that an alien's statements would be admissible in a criminal trial, the regulation would not accomplish its purpose because the warnings required by the regulation do not go nearly as far as *Miranda*. Full compliance with the regulation would still leave the statement inadmissible in a criminal trial. Therefore, it is much more reasonable to read the regulation as applicable to situations where only a deportation hearing is foreseen. Perhaps it was not necessary to have read Ms. Navia-Duran the full *Miranda* warnings printed on the interrogation form (although we are troubled by the use of a form which suggests greater rights than actually exist, even though Ms. Navia-Duran could not read the words). But the appellant was entitled to information about the rights specified in 8 C.F.R. § 287.3.

If the INS had complied with its own regulation,[9] then Ms. Navia-Duran would have been aware of her right to a deportation hearing, for the warnings required by the regulation clearly imply the existence of a superior decisionmaker. Had she been made fully aware of her rights, the atmosphere of coercion would have vanished, for the appellant might then have taken Agent Constance's "fair deal" offer with a grain of salt.

■ Instead, the picture presented here is one of an overzealous immigration agent seeking to intimidate an alien in order to effectuate deportation without the procedural niceties of a hearing. It appears to us that the agent actively misinformed the appellant and that her statement emanated from fear, ignorance, and agency-cultivated miscomprehension of her rights. Repeatedly told that she had "no choice" and that she must leave "immediately" or "in two weeks," Ms. Navia-Duran was induced to believe that Agent Constance controlled her fate. Isolated from her friends, inexperienced in American justice, taken from her home to a strange office late at night, Ms. Navia-Duran can not be said to have spoken freely and voluntarily when she admitted her alienage. *Haynes v. Washington*, 373 U.S. 503, 83 S.Ct. 1336, 10 L.Ed.2d 513 (1963); *Lynumn v. Illinois*, 372 U.S. 528, 83 S.Ct. 917, 9 L.Ed.2d 922 (1963).

A coerced confession was held inadmissible in a deportation hearing in *Bong Youn Choy v. Barber*, 279 F.2d 642 (9th Cir. 1960). In that case, a well-educated alien went voluntarily to INS headquarters for questioning. He was told that if he did not admit to being a Communist he would be deported in three weeks or prosecuted for perjury. After seven hours of interrogation, Choy left, still denying his Communist affiliation. He returned the next day, after a sleepless night, and signed a confession which was used against him at his deportation hearing. In reversing the deportation order, the Court of Appeals for the Ninth Circuit stated:

> Expulsion cannot turn upon utterances cudgeled from the alien by governmental authorities; statements made by the alien and used to achieve his deportation must be voluntarily given.

*Id.* at 646. The Court acknowledged dictum in an early Supreme Court decision which had stated that the rule against the use of involuntary confessions would not apply in deportation proceedings. In *United States ex rel. Bilokumsky v. Tod*, 263 U.S. 149, 44 S.Ct. 54, 68 L.Ed. 221 (1923), the Supreme Court had followed up that statement by saying that an essential element of due process must be absent in order to render a deportation hearing unfair.

---

9. The regulation also provided for examination of the alien by other than the arresting officer "unless no other qualified officer is readily available." 8 C.F.R. § 287.3. Of course, when an alien is spirited away late at night to INS headquarters, it is unlikely that another officer will be readily available. Surely that regulation does not condone midnight interrogations. Its spirit if not its letter was certainly breached.

We agree with the Ninth Circuit decision which reasons that this old Supreme Court dictum has been undercut by later cases which recognize that the rule against involuntary confessions *is* an essential element of due process. *See, e. g., Chambers v. Florida*, 309 U.S. 227, 60 S.Ct. 472, 84 L.Ed. 716 (1940). Numerous Supreme Court decisions have rejected the use of coerced confessions in criminal cases because of their inherent unreliability. *See, e. g., Spano v. New York*, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). That same potential deficiency exists here.

Given the inadmissibility of the signed statement, the INS is left with no evidence to support the deportation order, much less "clear, unequivocal and convincing evidence" as required by 8 C.F.R. § 242.14(a), or "reasonable, substantial and probative evidence" as required by 8 U.S.C. § 1105a(a)(4) (1970) and 8 U.S.C. § 1252(b)(4) (1970).

■ We have previously considered the Government's burden of proof in a deportation hearing in *Sint v. Immigration and Naturalization Service*, 500 F.2d 120 (1st Cir. 1974). There we held that the Government's failure of proof required reversal of the deportation order, because it is improper to put the burden of proof on the alien, when the Government has not first met its burden. Although 8 U.S.C. § 1361 (1970) states that the alien's failure to show the time, place, and manner of entry results in a presumption of illegal presence in this country, that presumption does not operate until the INS had made out a prima facie case. Any other interpretation would be contrary to *Sint*, where the INS had presented some proof but not enough to carry its initial burden. As noted in the concurring opinion to the *Sint* decision:

> [T]he United States Government should not be bailed out from the need to present an adequate *prima facie* case where the matter to be proven is so patently simple and within its power to prove. We should not encourage the cutting of corners by an agency having such significant responsibilities.

500 F.2d at 124. In this case, where the only evidence presented was Ms. Navia-Duran's admission, there can be no doubt that the inadmissibility of that statement leaves the deportation order totally unsupported.

REVERSED and REMANDED.